NIXON, ATTORNEY GENERAL OF MISSOURI, ET AL.
*v.* SHRINK MISSOURI GOVERNMENT PAC ET AL.

No. 98–963. Argued October 5, 1999—Decided January 24, 2000

378

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 398. BREYER, J., filed a concurring opinion, in which GINSBURG, J., joined, *post*, p. 399. KENNEDY, J., filed a dissenting opinion, *post*, p. 405. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 410.

*Jeremiah W. Nixon*, Attorney General of Missouri, *pro se*, argued the cause for petitioners. With him on the briefs were *James R. Layton*, State Solicitor, *Paul R. Maguffee*, Assistant Attorney General, *Carter G. Phillips*, *Virginia A. Seitz*, and *Joseph R. Guerra*.

*Solicitor General Waxman* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Assistant Attorney General Ogden*, *Deputy Solicitor General Underwood*, *Malcolm L. Stewart*, *Douglas N. Letter*, and *Michael Jay Singer*.

*D. Bruce La Pierre* argued the cause for respondents. With him on the briefs for respondents Shrink Missouri Government PAC et al. was *Patric Lester*. *Deborah Goldberg*,

*Burt Neuborne,* and *Gerald P. Greiman* filed briefs for Joan Bray as respondent under this Court's Rule 12.6.*

JUSTICE SOUTER delivered the opinion of the Court.

The principal issues in this case are whether *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam),* is authority for state limits on contributions to state political candidates and

*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Edward B. Foley,* State Solicitor, *David M. Gormley, Iver A. Stridiron,* Acting Attorney General of the U. S. Virgin Islands, and by the Attorneys General for their respective States as follows: *Barbara Ritchie* of Alaska, *Janet Napolitano* of Arizona, *Mark Pryor* of Arkansas, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Jeffrey A. Modisett* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Albert B. Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Joseph P. Mazurek* of Montana, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *Michael F. Easley* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Sheldon Whitehouse* of Rhode Island, *Paul G. Summers* of Tennessee, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *Christine O. Gregoire* of Washington; for Common Cause et al. by *Roger M. Witten, Daniel H. Squire, Donald J. Simon,* and *Fred Wertheimer;* for Public Citizen by *Alan B. Morrison* and *David C. Vladeck;* for the Secretary of State of Arkansas et al. by *Gregory Luke, John C. Bonifaz,* and *Brenda Wright;* for Senator John F. Reed et al. by *Donald B. Verrilli, Jr., Deanne E. Maynard,* and *Gregory P. Magarian;* for Paul Allen Beck et al. by *Evan A. Davis;* and for Norman Dorsen et al. by *Charles S. Sims.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Joel M. Gora* and *Steven R. Shapiro;* for the First Amendment Project of the Americans Back in Charge Foundation et al. by *Cleta D. Mitchell* and *Paul E. Sullivan;* for Gun Owners of America et al. by *William J. Olson* and *John S. Miles;* for the James Madison Center for Free Speech by *James Bopp, Jr.;* for the National Right to Life PAC State Fund et al. by *Mr. Bopp;* for the Pacific Legal Foundation et al. by *Sharon L. Browne;* for Senator Mitch McConnell et al. by *Bobby R. Burchfield;* and for U. S. Term Limits, Inc., by *Stephen J. Safranek.*

whether the federal limits approved in *Buckley*, with or without adjustment for inflation, define the scope of permissible state limitations today. We hold *Buckley* to be authority for comparable state regulation, which need not be pegged to *Buckley*'s dollars.

I

In 1994, the Legislature of Missouri enacted Senate Bill 650 to restrict the permissible amounts of contributions to candidates for state office. Mo. Rev. Stat. § 130.032 (1994). Before the statute became effective, however, Missouri voters approved a ballot initiative with even stricter contribution limits, effective immediately. The United States Court of Appeals for the Eighth Circuit then held the initiative's contribution limits unconstitutional under the First Amendment, *Carver* v. *Nixon*, 72 F. 3d 633, 645 (CA8 1995), cert. denied, 518 U. S. 1033 (1996), with the upshot that the previously dormant 1994 statute took effect. *Shrink Missouri Government PAC* v. *Adams*, 161 F. 3d 519, 520 (CA8 1998).

As amended in 1997, that statute imposes contribution limits ranging from $250 to $1,000, depending on specified state office or size of constituency. See Mo. Rev. Stat. § 130.032.1 (1998 Cum. Supp.); 161 F. 3d, at 520. The particular provision challenged here reads that

> "[t]o elect an individual to the office of governor, lieutenant governor, secretary of state, state treasurer, state auditor or attorney general, [[t]he amount of contributions made by or accepted from any person other than the candidate in any one election shall not exceed] one thousand dollars." Mo. Rev. Stat. § 130.032.1(1) (1998 Cum. Supp.).

The statutory dollar amounts are baselines for an adjustment each even-numbered year, to be made "by multiplying the base year amount by the cumulative consumer price

index . . . and rounded to the nearest twenty-five-dollar amount, for all years since January 1, 1995." § 130.032.2. When this suit was filed, the limits ranged from a high of $1,075 for contributions to candidates for statewide office (including state auditor) and for any office where the population exceeded 250,000, down to $275 for contributions to candidates for state representative or for any office for which there were fewer than 100,000 people represented. 161 F. 3d, at 520; App. 37.

Respondents Shrink Missouri Government PAC, a political action committee, and Zev David Fredman, a candidate for the 1998 Republican nomination for state auditor, sought to enjoin enforcement of the contribution statute[1] as violating their First and Fourteenth Amendment rights (presumably those of free speech, association, and equal protection, although the complaint did not so state). Shrink Missouri gave $1,025 to Fredman's candidate committee in 1997, and another $50 in 1998. Shrink Missouri represented that, without the limitation, it would contribute more to the Fredman campaign. Fredman alleged he could campaign effectively only with more generous contributions than § 130.032.1 allowed. *Shrink Missouri Government PAC* v. *Adams*, 5 F. Supp. 2d 734, 737 (ED Mo. 1998).

On cross-motions for summary judgment, the District Court sustained the statute. *Id.*, at 742. Applying *Buckley* v. *Valeo, supra,* the court found adequate support for the law in the proposition that large contributions raise suspicions of influence peddling tending to undermine citizens' confidence "in the integrity of . . . government." 5 F. Supp. 2d, at 738. The District Court rejected respondents' con-

---

[1] Respondents sued members of the Missouri Ethics Commission, the Missouri attorney general, and the St. Louis County prosecuting attorney. *Shrink Missouri Government PAC* v. *Adams*, 5 F. Supp. 2d 734, 737 (ED Mo. 1998).

tention that inflation since *Buckley*'s approval of a federal $1,000 restriction meant that the state limit of $1,075 for a statewide office could not be constitutional today. 5 F. Supp. 2d, at 740.

The Court of Appeals for the Eighth Circuit nonetheless enjoined enforcement of the law pending appeal, 151 F. 3d 763, 765 (1998), and ultimately reversed the District Court, 161 F. 3d, at 520. Finding that *Buckley* had " 'articulated and applied a strict scrutiny standard of review,' " the Court of Appeals held that Missouri was bound to demonstrate "that it has a compelling interest and that the contribution limits at issue are narrowly drawn to serve that interest." 161 F. 3d, at 521 (quoting *Carver* v. *Nixon, supra,* at 637). The appeals court treated Missouri's claim of a compelling interest "in avoiding the corruption or the perception of corruption brought about when candidates for elective office accept large campaign contributions" as insufficient by itself to satisfy strict scrutiny. 161 F. 3d, at 521–522. Relying on Circuit precedent, see *Russell* v. *Burris,* 146 F. 3d 563, 568 (CA8), cert. denied, 525 U. S. 1001 (1998); *Carver* v. *Nixon, supra,* at 638, the Court of Appeals required

> "some demonstrable evidence that there were genuine problems that resulted from contributions in amounts greater than the limits in place. . . .
> "[T]he *Buckley* Court noted the perfidy that had been uncovered in federal campaign financing in 1972. . . . But we are unwilling to extrapolate from those examples that in Missouri at this time there is corruption or a perception of corruption from 'large' campaign contributions, without some evidence that such problems really exist." 161 F. 3d, at 521–522 (citations omitted).

The court thought that the only evidence presented by the State, an affidavit from the cochairman of the state legislature's Interim Joint Committee on Campaign Finance Reform when the statute was passed, was inadequate to raise

a genuine issue of material fact about the State's alleged interest in limiting campaign contributions. *Ibid.*[2]

Given the large number of States that limit political contributions, see generally Federal Election Commission, E. Feigenbaum & J. Palmer, Campaign Finance Law 98 (1998), we granted certiorari to review the congruence of the Eighth Circuit's decision with *Buckley.* 525 U. S. 1121 (1999). We reverse.

## II

The matters raised in *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam),* included claims that federal campaign finance legislation infringed speech and association protections of the First Amendment and the equal protection guarantee of the Fifth. The Federal Election Campaign Act of 1971, 86 Stat. 3, as amended by the Federal Election Campaign Act Amendments of 1974, 88 Stat. 1263, limited (and still limits) contributions by individuals to any single candidate for federal office to $1,000 per election. 18 U. S. C. §§ 608(b)(1), (3) (1970 ed., Supp. IV); *Buckley* v. *Valeo, supra,* at 13. Until *Buckley* struck it down, the law also placed a $1,000 annual ceiling on independent expenditures linked to specific candidates. 18 U. S. C. § 608(e) (1970 ed., Supp. IV); 424 U. S., at 13. We found violations of the First Amendment in the expenditure regulations, but held the contribution restrictions constitutional. *Buckley* v. *Valeo, supra.*

---

[2] Chief Judge Bowman also would have found the law invalid because the contribution limits were severely tailored beyond any need to serve the State's interest. Comparing the Missouri limits with those considered in *Buckley,* the Chief Judge said that "[a]fter inflation, limits of $1,075, $525, and $275 cannot compare with the $1,000 limit approved in *Buckley* twenty-two years ago," and "can only be regarded as 'too low to allow meaningful participation in protected political speech and association.'" 161 F. 3d, at 522–523 (quoting *Day* v. *Holahan,* 34 F. 3d 1356, 1366 (CA8 1994), cert. denied, 513 U. S. 1127 (1995)). Judge Ross, concurring in the judgment, did not join this portion of Chief Judge Bowman's opinion. 161 F. 3d, at 523.

Judge Gibson dissented from the panel's decision. *Ibid.*

## A

Precision about the relative rigor of the standard to review contribution limits was not a pretense of the *Buckley per curiam* opinion. To be sure, in addressing the speech claim, we explicitly rejected both *O'Brien* intermediate scrutiny for communicative action, see *United States* v. *O'Brien*, 391 U. S. 367 (1968), and the similar standard applicable to merely time, place, and manner restrictions, see *Adderley* v. *Florida*, 385 U. S. 39 (1966); *Cox* v. *Louisiana*, 379 U. S. 536 (1965); *Kovacs* v. *Cooper*, 336 U. S. 77 (1949). In distinguishing these tests, the discussion referred generally to "the exacting scrutiny required by the First Amendment," *Buckley* v. *Valeo*, 424 U. S., at 16, and added that "'the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political·office,'" *id.*, at 15 (quoting *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 272 (1971)).

We then, however, drew a line between expenditures and contributions, treating expenditure restrictions as direct restraints on speech, 424 U. S., at 19, which nonetheless suffered little direct effect from contribution limits:

"[A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or

campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.*, at 20–21 (footnote omitted).

We thus said, in effect, that limiting contributions left communication significantly unimpaired.

We flagged a similar difference between expenditure and contribution limitations in their impacts on the association right. While an expenditure limit "precludes most associations from effectively amplifying the voice of their adherents," *id.*, at 22 (thus interfering with the freedom of the adherents as well as the association, *ibid.*), the contribution limits "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates," *ibid.*; see also *id.*, at 28. While we did not then say in so many words that different standards might govern expenditure and contribution limits affecting associational rights, we have since then said so explicitly in *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 259–260 (1986): "We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending." It has, in any event, been plain ever since *Buckley* that contribution limits would more readily clear the hurdles before them. Cf. *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 610 (1996) (opinion of BREYER, J.) (noting that in campaign finance case law, "[t]he provisions that the Court found constitutional mostly imposed *contribution* limits" (emphasis in original)). Thus, under *Buckley*'s standard of scrutiny, a contribution limit involving "significant interference" with associational rights, 424 U. S., at 25 (internal quotation marks omitted), could survive if the Government demonstrated that contribution regulation was "closely drawn"

to match a "sufficiently important interest," *ibid.*, though the dollar amount of the limit need not be "fine tun[ed]," *id.*, at 30.[3]

While we did not attempt to parse distinctions between the speech and association standards of scrutiny for contribution limits, we did make it clear that those restrictions bore more heavily on the associational right than on freedom to speak. *Id.*, at 24–25. We consequently proceeded on the understanding that a contribution limitation surviving a claim of associational abridgment would survive a speech challenge as well, and we held the standard satisfied by the contribution limits under review.

"[T]he prevention of corruption and the appearance of corruption" was found to be a "constitutionally sufficient justification," *id.*, at 25–26:

"To the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined. . . .

"Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions. . . . Congress could legiti-

---

[3] The quoted language addressed the correlative overbreadth challenge. On the point of classifying the standard of scrutiny, compare *Roberts* v. *United States Jaycees,* 468 U. S. 609, 623 (1984) ("Infringements on [the right to associate for expressive purposes] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms"); *NAACP* v. *Button,* 371 U. S. 415, 438 (1963) ("The decisions of this Court have consistently held that only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms"); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460–461 (1958) ("[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny").

mately conclude that the avoidance of the appearance of improper influence 'is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent.'" *Id.*, at 26–27 (quoting *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 565 (1973)).

See also *Federal Election Comm'n* v. *National Conservative Political Action Comm.*, 470 U. S. 480, 497 (1985) ("Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns"); *Federal Election Comm'n* v. *National Right to Work Comm.*, 459 U. S. 197, 208 (1982) (noting that Government interests in preventing corruption or the appearance of corruption "directly implicate 'the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process'" (quoting *United States* v. *Automobile Workers*, 352 U. S. 567, 570 (1957))); *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 788, n. 26 (1978) ("The importance of the governmental interest in preventing [corruption] has never been doubted").

In speaking of "improper influence" and "opportunities for abuse" in addition to *"quid pro quo* arrangements," we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the power of money "to influence governmental action" in ways less "blatant and specific" than bribery. *Buckley* v. *Valeo*, 424 U. S., at 28.[4]

---

[4] In arguing that the *Buckley* standard should not be relaxed, respondents Shrink Missouri and Fredman suggest that a candidate like Fredman suffers because contribution limits favor incumbents over challengers. Brief for Respondents Shrink Missouri Government PAC et al. 23–24. This is essentially an equal protection claim, which *Buckley* squarely

B

In defending its own statute, Missouri espouses those same interests of preventing corruption and the appearance of it that flows from munificent campaign contributions. Even without the authority of *Buckley*, there would be no serious question about the legitimacy of the interests claimed, which, after all, underlie bribery and antigratuity statutes. While neither law nor morals equate all political contributions, without more, with bribes, we spoke in *Buckley* of the perception of corruption "inherent in a regime of large individual financial contributions" to candidates for public office, *id.*, at 27, as a source of concern "almost equal" to *quid pro quo* improbity, *ibid.* The public interest in countering that perception was, indeed, the entire answer to the overbreadth claim raised in the *Buckley* case. *Id.*, at 30. This made perfect sense. Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance. Democracy works "only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption." *United States* v. *Mississippi Valley Generating Co.*, 364 U. S. 520, 562 (1961).

Although respondents neither challenge the legitimacy of these objectives nor call for any reconsideration of *Buckley*, they take the State to task, as the Court of Appeals did, for failing to justify the invocation of those interests with empirical evidence of actually corrupt practices or of a per-

---

faced. We found no support for the proposition that an incumbent's advantages were leveraged into something significantly more powerful by contribution limitations applicable to all candidates, whether veterans or upstarts, 424 U. S., at 31–35. Since we do not relax *Buckley*'s standard, no more need be said about respondents' argument, though we note that nothing in the record here gives respondents a stronger argument than the *Buckley* petitioners made.

ception among Missouri voters that unrestricted contributions must have been exerting a covertly corrosive influence. The state statute is not void, however, for want of evidence.

The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised. *Buckley* demonstrates that the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible. The opinion noted that "the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem [of corruption] is not an illusory one." 424 U. S., at 27, and n. 28. Although we did not ourselves marshal the evidence in support of the congressional concern, we referred to "a number of the abuses" detailed in the Court of Appeals's decision, *ibid.*, which described how corporations, well-financed interest groups, and rich individuals had made large contributions, some of which were illegal under existing law, others of which reached at least the verge of bribery. See *Buckley* v. *Valeo*, 519 F. 2d 821, 839–840, and nn. 36–38 (CADC 1975). The evidence before the Court of Appeals described public revelations by the parties in question more than sufficient to show why voters would tend to identify a big donation with a corrupt purpose.

While *Buckley*'s evidentiary showing exemplifies a sufficient justification for contribution limits, it does not speak to what may be necessary as a minimum.[5] As to that, respond-

---

[5] Cf. *Federal Election Comm'n* v. *National Right to Work Comm.*, 459 U. S. 197, 210 (1982) ("Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared"); *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 788, n. 26 (1978); *California Medical Assn.* v. *Federal Election Comm'n*, 453 U. S. 182, 194–195 (1981) (noting that *Buckley* held that contribution limits "served the important governmental interests in preventing the corruption or appearance of corruption of the political process that might result if such contributions were not restrained"); *Citizens Against Rent Control/ Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 296–297 (1981)

ents are wrong in arguing that in the years since *Buckley* came down we have "supplemented" its holding with a new requirement that governments enacting contribution limits must "'demonstrate that the recited harms are real, not merely conjectural,'" Brief for Respondents Shrink Missouri Government PAC et al. 26 (quoting *United States* v. *Treasury Employees,* 513 U. S. 454, 475 (1995) (in turn quoting *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 664 (1994))), a contention for which respondents rely principally on *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604 (1996). We have never accepted mere conjecture as adequate to carry a First Amendment burden, and *Colorado Republican* did not deal with a government's burden to justify limits on contributions. Although the principal opinion in that case charged the Government with failure to show a real risk of corruption, *id.,* at 616 (opinion of BREYER, J.), the issue in question was limits on independent expenditures by political parties, which the principal opinion expressly distinguished from contribution limits: "limitations on independent expenditures are less directly related to preventing corruption" than contributions are, *id.,* at 615. In that case, the "constitutionally significant fact" that there was no "coordination between the candidate and the source of the expenditure" kept the principal opinion "from assuming, absent convincing evidence to the contrary, that [a limitation on expenditures] is necessary to combat a substantial danger of corruption of the

("*Buckley* identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a *candidate*"); see also *Federal Election Comm'n* v. *National Conservative Political Action Comm.,* 470 U. S. 480, 500 (1985) (observing that *Buckley* upheld contribution limits as constitutional, and noting the Court's "deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized").

electoral system." *Id.*, at 617–618. *Colorado Republican* thus goes hand in hand with *Buckley*, not toe to toe.

In any event, this case does not present a close call requiring further definition of whatever the State's evidentiary obligation may be. While the record does not show that the Missouri Legislature relied on the evidence and findings accepted in *Buckley*,[6] the evidence introduced into the record by petitioners or cited by the lower courts in this action and the action regarding Proposition A is enough to show that the substantiation of the congressional concerns reflected in *Buckley* has its counterpart supporting the Missouri law. Although Missouri does not preserve legislative history, 5 F. Supp. 2d, at 738, the State presented an affidavit from State Senator Wayne Goode, the co-chair of the state legislature's Interim Joint Committee on Campaign Finance Reform at the time the State enacted the contribution limits, who stated that large contributions have " 'the real potential to buy votes,' " *ibid.*; App. 47. The District Court cited newspaper accounts of large contributions supporting inferences of impropriety. 5 F. Supp. 2d, at 738, n. 6. One report questioned the state treasurer's decision to use a certain bank for most of Missouri's banking business after that institution contributed $20,000 to the treasurer's campaign. Editorial, The Central Issue is Trust, St. Louis Post-Dispatch, Dec. 31, 1993, p. 6C. Another made much of the receipt by a candidate for state auditor of a $40,000 contribution from a brewery and one for $20,000 from a bank. J. Mannies, Auditor Race May Get Too Noisy to be Ignored, St. Louis Post-Dispatch, Sept. 11, 1994, at 4B. In *Carver* v. *Nixon*, 72 F. 3d 633 (1995), the Eighth Circuit itself, while

---

[6] Cf. *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 51–52 (1986) ("The First Amendment does not require a city, before enacting . . . an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses").

invalidating the limits Proposition A imposed, identified a $420,000 contribution to candidates in northern Missouri from a political action committee linked to an investment bank, and three scandals, including one in which a state representative was "accused of sponsoring legislation in exchange for kickbacks," and another in which Missouri's former attorney general pleaded guilty to charges of conspiracy to misuse state property, *id.*, at 642, and n. 10, after being indicted for using a state workers' compensation fund to benefit campaign contributors. And although majority votes do not, as such, defeat First Amendment protections, the statewide vote on Proposition A certainly attested to the perception relied upon here: "[A]n overwhelming 74 percent of the voters of Missouri determined that contribution limits are necessary to combat corruption and the appearance thereof." *Carver* v. *Nixon*, 882 F. Supp. 901, 905 (WD Mo.), rev'd, 72 F. 3d 633 (CA8 1995); see also 5 F. Supp. 2d, at 738, n. 7.

There might, of course, be need for a more extensive evidentiary documentation if respondents had made any showing of their own to cast doubt on the apparent implications of *Buckley*'s evidence and the record here, but the closest respondents come to challenging these conclusions is their invocation of academic studies said to indicate that large contributions to public officials or candidates do not actually result in changes in candidates' positions. Brief for Respondents Shrink Missouri Government PAC et al. 41; Smith, Money Talks: Speech, Corruption, Equality, and Campaign Finance, 86 Geo. L. J. 45, 58 (1997); Smith, Faulty Assumptions and Undemocratic Consequences of Campaign Finance Reform, 105 Yale L. J. 1049, 1067–1068 (1995). Other studies, however, point the other way. Reply Brief for Respondent Bray 4–5; F. Sorauf, Inside Campaign Finance 169 (1992); Hall & Wayman, Buying Time: Moneyed Interests and the Mobilization of Bias in Congressional Committees, 84 Am. Pol. Sci. Rev. 797 (1990); D. Magleby & C. Nelson, The Money Chase 78 (1990). Given the conflict among these publica-

tions, and the absence of any reason to think that public perception has been influenced by the studies cited by respondents, there is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters.

## C

Nor do we see any support for respondents' various arguments that in spite of their striking resemblance to the limitations sustained in *Buckley*, those in Missouri are so different in kind as to raise essentially a new issue about the adequacy of the Missouri statute's tailoring to serve its purposes.[7] Here, as in *Buckley*, "[t]here is no indication . . . that the contribution limitations imposed by the [law] would have any dramatic[ally] adverse effect on the funding of campaigns and political associations," and thus no showing that

---

[7] Two of respondents' *amici* raise the different argument, that contribution limits are insufficiently narrow, in the light of disclosure requirements and bribery laws as less restrictive mechanisms for dealing with *quid pro quo* threats and apprehensions. Brief for Pacific Legal Foundation et al. as *Amici Curiae* 23–29. We specifically rejected this notion in *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, where we said that antibribery laws "deal with only the most blatant and specific attempts of those with money to influence government action," and that "Congress was surely entitled to conclude that disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed." *Id.*, at 28. We understood contribution limits, on the other hand, to "focu[s] precisely on the problem of large campaign contributions—the narrow aspect of political association where the actuality and potential for corruption have been identified—while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." *Ibid.* There is no reason to view contribution limits any differently today.

"the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." 424 U. S., at 21. The District Court found here that in the period since the Missouri limits became effective, "candidates for state elected office [have been] quite able to raise funds sufficient to run effective campaigns," 5 F. Supp. 2d, at 740, and that "candidates for political office in the state are still able to amass impressive campaign war chests," id., at 741.[8] The plausibility of these conclusions is buttressed by petitioners' evidence that in the 1994 Missouri elections (before any relevant state limitations went into effect), 97.62 percent of all contributors to candidates for state auditor made contributions of $2,000 or less. Ibid.; App. 34–36.[9] Even if we were to assume that the contribution limits affected respondent Fredman's ability to wage a competitive campaign (no small assumption given that Fredman only identified one contributor, Shrink Missouri, that would have given him more than $1,075 per election), a showing of one affected individual does not point up a system of suppressed political advocacy that would be unconstitutional under Buckley.

These conclusions of the District Court and the supporting evidence also suffice to answer respondents' variant claim that the Missouri limits today differ in kind from Buckley's owing to inflation since 1976. Respondents seem to assume that Buckley set a minimum constitutional threshold for contribution limits, which in dollars adjusted for loss of purchasing power are now well above the lines drawn by Missouri. But this assumption is a fundamental misunderstanding of what we held.

---

[8] This case does not, however, involve any claim that the Missouri law has restricted access to the ballot in any election other than that for state auditor.

[9] Similarly, data showed that less than 1.5 percent of the contributors to candidates in the 1992 election for Missouri secretary of state made aggregate contributions in excess of $2,000. 5 F. Supp. 2d, at 741; App. 35.

In *Buckley,* we specifically rejected the contention that $1,000, or any other amount, was a constitutional minimum below which legislatures could not regulate. As indicated above, we referred instead to the outer limits of contribution regulation by asking whether there was any showing that the limits were so low as to impede the ability of candidates to "amas[s] the resources necessary for effective advocacy," 424 U. S., at 21. We asked, in other words, whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless. Such being the test, the issue in later cases cannot be truncated to a narrow question about the power of the dollar, but must go to the power to mount a campaign with all the dollars likely to be forthcoming. As Judge Gibson put it, the dictates of the First Amendment are not mere functions of the Consumer Price Index. 161 F. 3d, at 525 (dissenting opinion).

## D

The dissenters in this case think our reasoning evades the real issue. JUSTICE THOMAS chides us for "hiding behind" *Buckley, post,* at 422, and JUSTICE KENNEDY faults us for seeing this case as "a routine application of our analysis" in *Buckley* instead of facing up to what he describes as the consequences of *Buckley, post,* at 405. Each dissenter would overrule *Buckley* and thinks we should do the same.

The answer is that we are supposed to decide this case. Shrink and Fredman did not request that *Buckley* be overruled; the furthest reach of their arguments about the law was that subsequent decisions already on the books had enhanced the State's burden of justification beyond what *Buckley* required, a proposition we have rejected as mistaken.

## III

There is no reason in logic or evidence to doubt the sufficiency of *Buckley* to govern this case in support of the Mis-

souri statute. The judgment of the Court of Appeals is, accordingly, reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

JUSTICE KENNEDY suggests that the misuse of soft money tolerated by this Court's misguided decision in *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604 (1996), demonstrates the need for a fresh examination of the constitutional issues raised by Congress' enactment of the Federal Election Campaign Acts of 1971 and 1974 and this Court's resolution of those issues in *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*. In response to his call for a new beginning, therefore, I make one simple point. Money is property; it is not speech.

Speech has the power to inspire volunteers to perform a multitude of tasks on a campaign trail, on a battleground, or even on a football field. Money, meanwhile, has the power to pay hired laborers to perform the same tasks. It does not follow, however, that the First Amendment provides the same measure of protection to the use of money to accomplish such goals as it provides to the use of ideas to achieve the same results.*

Our Constitution and our heritage properly protect the individual's interest in making decisions about the use of his or her own property. Governmental regulation of such decisions can sometimes be viewed either as "deprivations of lib-

---

*Unless, of course, the prohibition entirely forecloses a channel of communication, such as the use of paid petition circulators. See, *e. g.*, *Meyer* v. *Grant*, 486 U. S. 414, 424 (1988) ("Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. . . . The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing").

erty" or as "deprivations of property," see, *e. g., Moore* v. *East Cleveland*, 431 U. S. 494, 513 (1977) (STEVENS, J., concurring in judgment). Telling a grandmother that she may not use her own property to provide shelter to a grandchild—or to hire mercenaries to work in that grandchild's campaign for public office—raises important constitutional concerns that are unrelated to the First Amendment. Because I did not participate in the Court's decision in *Buckley*, I did not have the opportunity to suggest then that those property and liberty concerns adequately explain the Court's decision to invalidate the expenditure limitations in the 1974 Act.

Reliance on the First Amendment to justify the invalidation of campaign finance regulations is the functional equivalent of the Court's candid reliance on the doctrine of substantive due process as articulated in the two prevailing opinions in *Moore* v. *East Cleveland*. The right to use one's own money to hire gladiators, or to fund "speech by proxy," certainly merits significant constitutional protection. These property rights, however, are not entitled to the same protection as the right to say what one pleases.

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, concurring.

The dissenters accuse the Court of weakening the First Amendment. They believe that failing to adopt a "strict scrutiny" standard "balance[s] away First Amendment freedoms." *Post*, at 410 (opinion of THOMAS, J.). But the principal dissent oversimplifies the problem faced in the campaign finance context. It takes a difficult constitutional problem and turns it into a lopsided dispute between political expression and government censorship. Under the cover of this fiction and its accompanying formula, the dissent would make the Court absolute arbiter of a difficult question best left, in the main, to the political branches. I write sepa-

rately to address the critical question of how the Court ought to review this kind of problem, and to explain why I believe the Court's choice here is correct.

If the dissent believes that the Court diminishes the importance of the First Amendment interests before us, it is wrong. The Court's opinion does not question the constitutional importance of political speech or that its protection lies at the heart of the First Amendment. Nor does it question the need for particularly careful, precise, and independent judicial review where, as here, that protection is at issue. But this is a case where constitutionally protected interests lie on both sides of the legal equation. For that reason there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words "strict scrutiny." Nor can we expect that mechanical application of the tests associated with "strict scrutiny"—the tests of "compelling interests" and "least restrictive means"—will properly resolve the difficult constitutional problem that campaign finance statutes pose. Cf. *Kovacs* v. *Cooper*, 336 U. S. 77, 96 (1949) (Frankfurter, J., concurring) (objecting, in the First Amendment context, to "oversimplified formulas"); see also *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 233–234 (1989) (STEVENS, J., concurring); *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 188–189 (1979) (Blackmun, J., concurring) (same).

On the one hand, a decision to contribute money to a campaign is a matter of First Amendment concern—not because money *is* speech (it is not); but because it *enables* speech. Through contributions the contributor associates himself with the candidate's cause, helps the candidate communicate a political message with which the contributor agrees, and helps the candidate win by attracting the votes of similarly minded voters. *Buckley* v. *Valeo*, 424 U. S. 1, 24–25 (1976) *(per curiam)*. Both political association and political communication are at stake.

On the other hand, restrictions upon the amount any one individual can contribute to a particular candidate seek to protect the integrity of the electoral process—the means through which a free society democratically translates political speech into concrete governmental action. See *id.*, at 26–27; *Burroughs* v. *United States*, 290 U. S. 534, 545 (1934) (upholding 1925 Federal Corrupt Practices Act by emphasizing constitutional importance of safeguarding the electoral process); see also *Burson* v. *Freeman*, 504 U. S. 191, 199 (1992) (plurality opinion) (recognizing compelling interest in preserving integrity of electoral process). Moreover, by limiting the size of the largest contributions, such restrictions aim to democratize the influence that money itself may bring to bear upon the electoral process. Cf. *Reynolds* v. *Sims*, 377 U. S. 533, 565 (1964) (in the context of apportionment, the Constitution "demands" that each citizen have "an equally effective voice"). In doing so, they seek to build public confidence in that process and broaden the base of a candidate's meaningful financial support, encouraging the public participation and open discussion that the First Amendment itself presupposes. See *Mills* v. *Alabama*, 384 U. S. 214, 218–219 (1966); *Whitney* v. *California*, 274 U. S. 357, 375–376 (1927) (Brandeis, J., concurring); A. Meiklejohn, Free Speech and Its Relation to Self-Government 24–27 (1948).

In service of these objectives, the statute imposes restrictions of degree. It does not deny the contributor the opportunity to associate with the candidate through a contribution, though it limits a contribution's size. Nor does it prevent the contributor from using money (alone or with others) to pay for the expression of the same views in other ways. Instead, it permits all supporters to contribute the same amount of money, in an attempt to make the process fairer and more democratic.

Under these circumstances, a presumption against constitutionality is out of place. I recognize that *Buckley* used

language that could be interpreted to the contrary. It said, for example, that it rejected "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others." 424 U.S., at 48–49. But those words cannot be taken literally. The Constitution often permits restrictions on the speech of some in order to prevent a few from drowning out the many— in Congress, for example, where constitutionally protected debate, Art. I, §6, is limited to provide every Member an equal opportunity to express his or her views. Or in elections, where the Constitution tolerates numerous restrictions on ballot access, limiting the political rights of some so as to make effective the political rights of the entire electorate. See, e. g., Storer v. Brown, 415 U.S. 724, 736 (1974). Regardless, as the result in Buckley made clear, the statement does not automatically invalidate a statute that seeks a fairer electoral debate through contribution limits, nor should it forbid the Court to take account of the competing constitutional interests just mentioned.

In such circumstances—where a law significantly implicates competing constitutionally protected interests in complex ways—the Court has closely scrutinized the statute's impact on those interests, but refrained from employing a simple test that effectively presumes unconstitutionality. Rather, it has balanced interests. And in practice that has meant asking whether the statute burdens any one such interest in a manner out of proportion to the statute's salutary effects upon the others (perhaps, but not necessarily, because of the existence of a clearly superior, less restrictive alternative). Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments—at least where that deference does not risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge. This approach is that taken in fact by Buckley for contributions, and

is found generally where competing constitutional interests are implicated, such as privacy, see, *e. g., Frisby* v. *Schultz,* 487 U. S. 474, 485–488 (1988) (balancing rights of privacy and expression); *Rowan* v. *Post Office Dept.,* 397 U. S. 728, 736 (1970) (same), First Amendment interests of listeners or viewers, see, *e. g., Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180, 192–194 (1997) (recognizing the speech interests of both viewers and cable operators); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 102–103 (1973) ("Balancing the various First Amendment interests involved in the broadcast media . . . is a task of a great delicacy and difficulty"); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 389–390 · (1969) (First Amendment permits the Federal Communications Commission to restrict the speech of some to enable the speech of others), and the integrity of the electoral process, see, *e. g., Burson, supra,* at 198–211 (weighing First Amendment rights against electoral integrity necessary for right to vote); *Anderson* v. *Celebrezze,* 460 U. S. 780, 788–790 (1983) (same); *Storer* v. *Brown, supra,* at 730 ("[T]here must be a substantial regulation of elections if they are to be fair and honest"). The approach taken by these cases is consistent with that of other constitutional courts facing similarly complex constitutional problems. See, *e. g., Bowman* v. *United Kingdom,* 26 Eur. Ct. H. R. 1 (European Comm'n of Human Rights 1998) (demanding proportionality in the campaign finance context); *Libman* v. *Quebec (Attorney General),* 151 D. L. R. (4th) 385 (Canada 1997) (same). For the dissenters to call the approach *"sui generis," post,* at 410 (opinion of THOMAS, J.), overstates their case.

Applying this approach to the present case, I would uphold the statute essentially for the reasons stated by the Court. I agree that the legislature understands the problem—the threat to electoral integrity, the need for democratization—better than do we. We should defer to its political judgment that unlimited spending threatens the integrity of the

electoral process. But we should not defer in respect to whether its solution, by imposing too low a contribution limit, significantly increases the reputation-related or media-related advantages of incumbency and thereby insulates legislators from effective electoral challenge. The statutory limit here, $1,075 (or 378, 1976 dollars), is low enough to raise such a question. But given the empirical information presented—the type of election at issue; the record of adequate candidate financing postreform; and the fact that the statute indexes the amount for inflation—I agree with the Court that the statute does not work disproportionate harm. The limit may have prevented the plaintiff, Zev David Fredman, from financing his own campaign for office, for Fredman's support among potential contributors was not sufficiently widespread. But any contribution statute (like any statute setting ballot eligibility requirements, see, e. g., Jenness v. Fortson, 403 U. S. 431, 442 (1971)) will narrow the field of conceivable challengers to some degree. Undue insulation is a practical matter, and it cannot be inferred automatically from the fact that the limit makes ballot access more difficult for one previously unsuccessful candidate.

The approach I have outlined here is consistent with the approach this Court has taken in many complex First Amendment cases. See supra, at 402–403. The Buckley decision, as well, might be interpreted as embodying sufficient flexibility for the problem at hand. After all, Buckley's holding seems to leave the political branches broad authority to enact laws regulating contributions that take the form of "soft money." It held public financing laws constitutional, 424 U. S., at 57, n. 65, 85–109. It says nothing one way or the other about such important proposed reforms as reduced-price media time. And later cases presuppose that the Federal Election Commission has the delegated authority to interpret broad statutory provisions in light of the campaign finance law's basic purposes, despite disagreements over whether the Commission has exercised that au-

thority in a particular case. See *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 619–621 (1996) (whether claimed "independent expenditure" is a "coordinated expenditure"); accord, *id.*, at 648–650 (STEVENS, J., dissenting). Alternatively, it might prove possible to reinterpret aspects of *Buckley* in light of the post-*Buckley* experience stressed by JUSTICE KENNEDY, *post*, at 406–409 (dissenting opinion), making less absolute the contribution/expenditure line, particularly in respect to independently wealthy candidates, whose expenditures might be considered contributions to their own campaigns.

But what if I am wrong about *Buckley?* Suppose *Buckley* denies the political branches sufficient leeway to enact comprehensive solutions to the problems posed by campaign finance. If so, like JUSTICE KENNEDY, I believe the Constitution would require us to reconsider *Buckley*. With that understanding I join the Court's opinion.

JUSTICE KENNEDY, dissenting.

The Court's decision has lasting consequences for political speech in the course of elections, the speech upon which democracy depends. Yet in defining the controlling standard of review and applying it to the urgent claim presented, the Court seems almost indifferent. Its analysis would not be acceptable for the routine case of a single protester with a hand-scrawled sign, see *City of Ladue* v. *Gilleo*, 512 U. S. 43 (1994), a few demonstrators on a public sidewalk, see *United States* v. *Grace*, 461 U. S. 171 (1983), or a driver who taped over the motto on his license plate because he disagreed with its message, see *Wooley* v. *Maynard*, 430 U. S. 705 (1977). Surely the Court's approach is unacceptable for a case announcing a rule that suppresses one of our most essential and prevalent forms of political speech.

It would be no answer to say that this is a routine application of our analysis in *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, to a similar set of facts, so that a cavalier dis-

missal of respondents' claim is appropriate. The justifica-
tions for the case system and *stare decisis* must rest upon
the Court's capacity, and responsibility, to acknowledge its
missteps. It is our duty to face up to adverse, unintended
consequences flowing from our own prior decisions. With
all respect, I submit the Court does not accept this obligation
in the case before us. Instead, it perpetuates and com-
pounds a serious distortion of the First Amendment result-
ing from our own intervention in *Buckley*. The Court is
concerned about voter suspicion of the role of money in poli-
tics. Amidst an atmosphere of skepticism, however, it
hardly inspires confidence for the Court to abandon the rig-
ors of our traditional First Amendment structure.

I

Zev David Fredman asks us to evaluate his speech claim
in the context of a system which favors candidates and of-
ficeholders whose campaigns are supported by soft money,
usually funneled through political parties. The Court pays
him no heed. The plain fact is that the compromise the
Court invented in *Buckley* set the stage for a new kind of
speech to enter the political system. It is covert speech.
The Court has forced a substantial amount of political speech
underground, as contributors and candidates devise ever
more elaborate methods of avoiding contribution limits, lim-
its which take no account of rising campaign costs. The pre-
ferred method has been to conceal the real purpose of the
speech. Soft money may be contributed to political parties
in unlimited amounts, see *Colorado Republican Federal
Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S.
604, 616 (1996), and is used often to fund so-called issue advo-
cacy, advertisements that promote or attack a candidate's po-
sitions without specifically urging his or her election or de-
feat. Briffault, Issue Advocacy: Redrawing the Elections/
Politics Line, 77 Texas L. Rev. 1751, 1752–1753 (1999). Issue
advocacy, like soft money, is unrestricted, see *Buckley*,

*supra*, at 42–44, while straightforward speech in the form of financial contributions paid to a candidate, speech subject to full disclosure and prompt evaluation by the public, is not. Thus has the Court's decision given us covert speech. This mocks the First Amendment. The current system would be unfortunate, and suspect under the First Amendment, had it evolved from a deliberate legislative choice; but its unhappy origins are in our earlier decree in *Buckley*, which by accepting half of what Congress did (limiting contributions) but rejecting the other (limiting expenditures) created a misshapen system, one which distorts the meaning of speech.

The irony that we would impose this regime in the name of free speech ought to be sufficient ground to reject *Buckley*'s wooden formula in the present case. The wrong goes deeper, however. By operation of the *Buckley* rule, a candidate cannot oppose this system in an effective way without selling out to it first. Soft money must be raised to attack the problem of soft money. In effect, the Court immunizes its own erroneous ruling from change. Rulings of this Court must never be viewed with more caution than when they provide immunity from their own correction in the political process and in the forum of unrestrained speech. The melancholy history of campaign finance in *Buckley*'s wake shows what can happen when we intervene in the dynamics of speech and expression by inventing an artificial scheme of our own.

The case in one sense might seem unimportant. It appears that Mr. Fredman was an outsider candidate who may not have had much of a chance. Yet, by binding him to the outdated limit of $1,075 per contribution in a system where parties can raise soft money without limitation and a powerful press faces no restrictions on use of its own resources to back its preferred candidates, the Court tells Mr. Fredman he cannot challenge the status quo unless he first gives into it. This is not the First Amendment with which I am familiar.

To defend its extension of *Buckley* to present times, the Court, of course, recites the dangers of corruption, or the appearance of corruption, when an interested person contributes money to a candidate. What the Court does not do is examine and defend the substitute it has encouraged, covert speech funded by unlimited soft money. In my view that system creates dangers greater than the one it has replaced. The first danger is the one already mentioned: that we require contributors of soft money and its beneficiaries to mask their real purpose. Second, we have an indirect system of accountability that is confusing, if not dispiriting, to the voter. The very disaffection or distrust that the Court cites as the justification for limits on direct contributions has now spread to the entire political discourse. *Buckley* has not worked.

My colleagues in the majority, in my respectful submission, do much disservice to our First Amendment jurisprudence by failing to acknowledge or evaluate the whole operation of the system that we ourselves created in *Buckley*. Our First Amendment principles surely tell us that an interest thought to be the compelling reason for enacting a law is cast into grave doubt when a worse evil surfaces in the law's actual operation. And our obligation to examine the operation of the law is all the more urgent when the new evil is itself a distortion of speech. By these measures the law before us cannot pass any serious standard of First Amendment review.

Among the facts the Court declines to take into account is the emergence of cyberspace communication by which political contributions can be reported almost simultaneously with payment. The public can then judge for itself whether the candidate or the officeholder has so overstepped that we no longer trust him or her to make a detached and neutral judgment. This is a far more immediate way to assess the integrity and the performance of our leaders than through the hidden world of soft money and covert speech.

Officeholders face a dilemma inherent in the democratic process and one that has never been easy to resolve: how to exercise their best judgment while soliciting the continued support and loyalty of constituents whose interests may not always coincide with that judgment. Edmund Burke captured the tension in his Speeches at Bristol. "Your representative owes you, not his industry only, but his judgment; and he betrays instead of serving you, if he sacrifices it to your opinion." E. Burke, Speeches of the Right Hon. Edmund Burke 130 (J. Burke ed. 1867). Whether our officeholders can discharge their duties in a proper way when they are beholden to certain interests both for reelection and for campaign support is, I should think, of constant concern not alone to citizens but to conscientious officeholders themselves. There are no easy answers, but the Constitution relies on one: open, robust, honest, unfettered speech that the voters can examine and assess in an ever-changing and more complex environment.

## II

To this point my view may seem to be but a reflection of what JUSTICE THOMAS has written, and to a large extent I agree with his insightful and careful discussion of our precedents. If an ensuing chapter must be written, I may well come out as he does, for his reasoning and my own seem to point to the conclusion that the legislature can do little by way of imposing limits on political speech of this sort. For now, however, I would leave open the possibility that Congress, or a state legislature, might devise a system in which there are some limits on both expenditures and contributions, thus permitting officeholders to concentrate their time and efforts on official duties rather than on fundraising. For the reasons I have sought to express, there are serious constitutional questions to be confronted in enacting any such scheme, but I would not foreclose it at the outset. I would overrule *Buckley* and then free Congress or state legislatures to attempt some new reform, if, based upon their own

considered view of the First Amendment, it is possible to do so. Until any reexamination takes place, however, the existing distortion of speech caused by the halfway house we created in *Buckley* ought to be eliminated. The First Amendment ought to be allowed to take its own course without further obstruction from the artificial system we have imposed. It suffices here to say that the law in question does not come even close to passing any serious scrutiny.

For these reasons, though I am in substantial agreement with what JUSTICE THOMAS says in his opinion, I have thought it necessary to file a separate dissent.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

In the process of ratifying Missouri's sweeping repression of political speech, the Court today adopts the analytic fallacies of our flawed decision in *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*. Unfortunately, the Court is not content to merely adhere to erroneous precedent. Under the guise of applying *Buckley,* the Court proceeds to weaken the already enfeebled constitutional protection that *Buckley* afforded campaign contributions. In the end, the Court employs a *sui generis* test to balance away First Amendment freedoms.

Because the Court errs with each step it takes, I dissent. As I indicated in *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 635–644 (1996) (opinion concurring in judgment and dissenting in part), our decision in *Buckley* was in error, and I would overrule it. I would subject campaign contribution limitations to strict scrutiny, under which Missouri's contribution limits are patently unconstitutional.

I

I begin with a proposition that ought to be unassailable: Political speech is the primary object of First Amendment

protection. See, *e. g.*, *Mills* v. *Alabama*, 384 U. S. 214, 218 (1966); *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring); T. Cooley, Constitutional Limitations *422; Z. Chafee, Free Speech in the United States 28 (1954); Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L. J. 1, 20 (1971); Sunstein, Free Speech Now, in The Bill of Rights in the Modern State 304–307 (G. Stone, R. Epstein, & C. Sunstein eds. 1992). The Founders sought to protect the rights of individuals to engage in political speech because a self-governing people depends upon the free exchange of political information. And that free exchange should receive the most protection when it matters the most—during campaigns for elective office. "The value and efficacy of [the right to elect the members of government] depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." Madison, Report on the Resolutions (1799), in 6 Writings of James Madison 397 (G. Hunt ed. 1906).

I do not start with these foundational principles because the Court openly disagrees with them—it could not, for they are solidly embedded in our precedents. See, *e. g.*, *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 223 (1989) ("[T]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office" (quoting *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 272 (1971))); *Brown* v. *Hartlage*, 456 U. S. 45, 53 (1982) ("The free exchange of ideas provides special vitality to the process traditionally at the heart of American constitutional democracy—the political campaign"); *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964) ("[S]peech concerning public affairs is . . . the essence of self-government"). Instead, I start with them because the Court today abandons them. For nearly half a century, this Court has extended First Amendment protection to a multitude of forms of

"speech," such as making false defamatory statements, filing lawsuits, dancing nude, exhibiting drive-in movies with nudity, burning flags, and wearing military uniforms.[1]  Not surprisingly, the Courts of Appeals have followed our lead and concluded that the First Amendment protects, for example, begging, shouting obscenities, erecting tables on a sidewalk, and refusing to wear a necktie.[2]  In light of the many cases of this sort, today's decision is a most curious anomaly. Whatever the proper status of such activities under the First Amendment, I am confident that they are less integral to the functioning of our Republic than campaign contributions. Yet the majority today, rather than going out of its way to *protect* political speech, goes out of its way to *avoid* protecting it.  As I explain below, contributions to political campaigns generate essential political speech.  And contribution caps, which place a direct and substantial limit on core speech, should be met with the utmost skepticism and should receive the strictest scrutiny.

## II

At bottom, the majority's refusal to apply strict scrutiny to contribution limits rests upon *Buckley*'s discounting of the First Amendment interests at stake.  The analytic foundation of *Buckley*, however, was tenuous from the very beginning and has only continued to erode in the intervening years.  What remains of *Buckley* fails to provide an adequate justification for limiting individual contributions to political candidates.

---

[1] *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964); *NAACP* v. *Button*, 371 U. S. 415 (1963); *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560 (1991) (plurality opinion); *Erznoznik* v. *Jacksonville*, 422 U. S. 205 (1975); *United States* v. *Eichman*, 496 U. S. 310 (1990); *Schacht* v. *United States*, 398 U. S. 58 (1970).

[2] *Loper* v. *New York City Police Dept.*, 999 F. 2d 699 (CA2 1993); *Sandul* v. *Larion*, 119 F. 3d 1250 (CA6 1997); *One World One Family Now* v. *Miami Beach*, 175 F. 3d 1282 (CA11 1999); *East Hartford Education Assoc.* v. *Board of Ed. of East Hartford*, 562 F. 2d 838 (CA2 1977).

## A

To justify its decision upholding contribution limitations while striking down expenditure limitations, the Court in *Buckley* explained that expenditure limits "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech," 424 U.S., at 19, while contribution limits "entai[l] only a marginal restriction upon the contributor's ability to engage in free communication," *id.*, at 20–21 (quoted *ante*, at 386). In drawing this distinction, the Court in *Buckley* relied on the premise that contributing to a candidate differs qualitatively from directly spending money. It noted that "[w]hile contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." 424 U. S., at 21. See also *California Medical Assn.* v. *Federal Election Comm'n*, 453 U. S. 182, 196 (1981) (plurality opinion) ("[T]he 'speech by proxy' that [a contributor] seeks to achieve through its contributions . . . is not the sort of political advocacy that this Court in *Buckley* found entitled to full First Amendment protection").

But this was a faulty distinction *ab initio* because it ignored the reality of how speech of all kinds is disseminated:

> "Even in the case of a direct expenditure, there is usually some go-between that facilitates the dissemination of the spender's message—for instance, an advertising agency or a television station. To call a contribution 'speech by proxy' thus does little to differentiate it from an expenditure. The only possible difference is that contributions involve an extra step in the proxy chain. But again, that is a difference in form, not substance." *Colorado Republican*, 518 U. S., at 638–639 (THOMAS, J., concurring in judgment and dissenting in part) (citations omitted).

And, inasmuch as the speech-by-proxy argument was disconnected from the realities of political speech to begin with, it is not surprising that we have firmly rejected it since *Buckley*. In *Federal Election Comm'n* v. *National Conservative Political Action Comm.*, 470 U. S. 480 (1985), we cast aside the argument that a contribution does not represent the constitutionally protected speech of a contributor, recognizing "that the contributors obviously like the message they are hearing from these organizations and want to add their voices to that message; otherwise they would not part with their money." *Id.*, at 495. Though in that case we considered limitations on expenditures made by associations, our holding that the speech-by-proxy argument fails to diminish contributors' First Amendment rights is directly applicable to this case. In both cases, donors seek to disseminate information by giving to an organization controlled by others. Through contributing, citizens see to it that their views on policy and politics are articulated. In short, "they are aware that however great the confidence they may justly feel in their own good sense, their interests can be more effectually promoted by [another] than by themselves." The Federalist No. 35, p. 214 (C. Rossiter ed. 1961) (A. Hamilton).

Without the assistance of the speech-by-proxy argument, the remainder of *Buckley's* rationales founder. Those rationales—that the "quantity of communication by the contributor does not increase perceptibly with the size of his contribution," *Buckley* v. *Valeo, supra,* at 21 (quoted *ante,* at 386), that "the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate," 424 U. S., at 21 (quoted *ante,* at 386), and that "[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support," 424 U. S., at 21 (quoted *ante,* at 386)—still rest on the proposition that speech by proxy is not fully protected. These contentions simply ig-

nore that a contribution, by amplifying the voice of the candidate, helps to ensure the dissemination of the messages that the contributor wishes to convey. Absent the ability to rest on the denigration of contributions as mere "proxy speech," the arguments fall apart.[3]

The decision of individuals to speak through contributions rather than through independent expenditures is entirely reasonable.[4] Political campaigns are largely candidate fo-

---

[3] If one were to accept the speech-by-proxy point and consider a contribution a mere symbolic gesture, *Buckley*'s auxiliary arguments still falter. The claim that a large contribution receives less protection because it only expresses the "intensity of the contributor's support for the candidate," *Buckley* v. *Valeo*, 424 U. S. 1, 21 (1976) *(per curiam)* (quoted *ante*, at 386), fails under our jurisprudence because we have accorded full First Amendment protection to expressions of intensity. See *Cohen* v. *California*, 403 U. S. 15, 25–26 (1971) (protecting the use of an obscenity to stress a point). Equally unavailing is the claim that a contribution warrants less protection because it "does not communicate the underlying basis for the support." *Buckley* v. *Valeo, supra*, at 21 (quoted *ante*, at 386). We regularly hold that speech is protected when the underlying basis for a position is not given. See, *e. g., City of Ladue* v. *Gilleo*, 512 U. S. 43, 46 (1994) (sign reading "For Peace in the Gulf"); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 510–511 (1969) (black armband signifying opposition to Vietnam war). See also *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 640 (1996) (THOMAS, J., concurring in judgment and dissenting in part) ("Even a pure message of support, unadorned with reasons, is valuable to the democratic process"). Cf. *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 569 (1995) (opinion of the Court by SOUTER, J.) ("[A] narrow, succinctly articulable message is not a condition of constitutional protection").

[4] JUSTICE STEVENS asserts that "[m]oney is property; it is not speech," *ante*, at 398 (concurring opinion), and contends that there is no First Amendment right "to hire mercenaries" and "to hire gladiators," *ante*, at 399. These propositions are directly contradicted by many of our precedents. For example, in *Meyer* v. *Grant*, 486 U. S. 414 (1988) (opinion of the Court by STEVENS, J.), this Court confronted a state ban on payments to petition circulators. The District Court upheld the law, finding that the ban on monetary payments did not restrain expression and that the

cused and candidate driven. Citizens recognize that the best advocate for a candidate (and the policy positions he supports) tends to be the candidate himself. And candidate organizations also offer other advantages to citizens wishing to partake in political expression. Campaign organizations offer a ready-built, convenient means of communicating for donors wishing to support and amplify political messages. Furthermore, the leader of the organization—the candidate—has a strong self-interest in efficiently expending funds in a manner that maximizes the power of the messages the contributor seeks to disseminate. Individual citizens understandably realize that they "may add more to political

would-be payors remained free to use their money in other ways. *Id.*, at 418. We disagreed and held that "[t]he refusal to permit appellees to pay petition circulators restricts political expression" by "limit[ing] the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach." *Id.*, at 422–423. In short, the Court held that the First Amendment protects the right to pay others to help get a message out. In other cases, this Court extended such protection, holding that the First Amendment prohibits laws that do not ban, but instead only regulate, the terms upon which so-called mercenaries and gladiators are retained. See *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781 (1988) (holding that the First Amendment prohibits state restriction on the amount a charity may pay a professional fundraiser); *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947 (1984) (same). Cf. also, *e. g., Teachers* v. *Hudson*, 475 U. S. 292 (1986) (opinion of the Court by STEVENS, J.) (holding that the First Amendment restrains government-compelled exactions of money); *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977) (same). In these cases, the Court did not resort to JUSTICE STEVENS' assertion that money "is not speech" to dismiss challenges to monetary regulations. Instead, the Court properly examined the impact of the regulations on free expression. See also, *e. g., Federal Election Comm'n* v. *National Conservative Political Action Comm.*, 470 U. S. 480 (1985) (First Amendment protects political committee's expenditures of money); *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290 (1981) (First Amendment protects monetary contributions to political committee); *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 769 (1978) (First Amendment protects "spend[ing] money to publicize [political] views").

discourse by giving rather than spending, if the donee is able to put the funds to more productive use than can the individual." *Colorado Republican,* 518 U. S., at 636 (THOMAS, J., concurring in judgment and dissenting in part). See also *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.,* 479 U. S. 238, 261 (1986) ("[I]ndividuals contribute to a political organization in part because they regard such a contribution as a more effective means of advocacy than spending the money under their own personal direction").[5]

In the end, *Buckley*'s claim that contribution limits "d[o] not in any way infringe the contributor's freedom to discuss candidates and issues," 424 U. S., at 21 (quoted *ante,* at 387), ignores the distinct role of candidate organizations as a means of individual participation in the Nation's civic dialogue.[6]  The result is simply the suppression of political

---

[5] Even if contributions to a candidate were not the most effective means of speaking—and contribution caps left political speech "significantly unimpaired," *ante,* at 387—an individual's choice of that mode of expression would still be protected.  "The First Amendment protects [individuals'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer, supra,* at 424 (opinion of the Court by STEVENS, J.).  See also *Glickman* v. *Wileman Brothers & Elliott, Inc.,* 521 U. S. 457, 488 (1997) (SOUTER, J., dissenting) (noting a "First Amendment interest in touting [one's] wares as he sees fit").

[6] *Buckley*'s approach to associational freedom is also unsound.  In defense of its decision, the Court in *Buckley* explained that contribution limits "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." 424 U. S., at 22 (quoted *ante,* at 387).  In essence, the Court accepted contribution limits because alternative channels of association remained open.  This justification, however, is peculiar because we have rejected the notion that a law will pass First Amendment muster simply because it leaves open other opportunities. *Spence* v. *Washington,* 418 U. S. 405, 411, n. 4 (1974) *(per curiam)* (Although a prohibition's effect may be " 'minuscule and trifling,' " a person " 'is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place' " (quoting *Schneider* v. *State (Town of Irvington),* 308 U. S. 147, 163 (1939))).  See also, *e. g., Texas* v. *Johnson,* 491 U. S. 397, 416, n. 11 (1989); *Kusper* v. *Pontikes,* 414 U. S. 51,

speech. By depriving donors of their right to speak through the candidate, contribution limits relegate donors' points of view to less effective modes of communication. Additionally, limiting contributions curtails individual participation. "Even for the affluent, the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a hand-held sign may make the difference between participating and not participating in some public debate." *City of Ladue* v. *Gilleo*, 512 U. S. 43, 57 (1994) (opinion of the Court by STEVENS, J.). *Buckley* completely failed in its attempt to provide a basis for permitting government to second-guess the individual choices of citizens partaking in quintessentially democratic activities. "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 790–791 (1988).

### B

The Court in *Buckley* denigrated the speech interests not only of contributors, but also of candidates. Although the Court purported to be concerned about the plight of candidates, it nevertheless proceeded to disregard their interests without justification. The Court did not even attempt to claim that contribution limits do not suppress the speech of political candidates. See 424 U. S., at 18 ("[C]ontribution ... limitations impose direct quantity restrictions on political communication and association by ... candidates"); *id.*, at 33 ("[T]he [contribution] limitations may have a significant effect on particular challengers or incumbents"). It could not have, given the reality that donations "mak[e] a significant contribution to freedom of expression by enhancing the

---

58 (1973). "For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." *Id.*, at 58–59.

ability of candidates to present, and the public to receive, information necessary for the effective operation of the democratic process." *CBS, Inc. v. FCC,* 453 U. S. 367, 396 (1981). See also *Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley,* 454 U. S. 290, 299 (1981) ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression"). Instead, the Court abstracted from a candidate's individual right to speak and focused exclusively on aggregate campaign funding. See *Buckley v. Valeo, supra,* at 21 ("There is no indication . . . that the contribution limitations imposed by the Act would have any dramatic adverse effect on the funding of campaigns") (quoted *ante,* at 395); *ante,* at 395–396 (There is "no showing that 'the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy'" (quoting *Buckley v. Valeo, supra,* at 21)).

The Court's flawed and unsupported aggregate approach ignores both the rights and value of individual candidates. The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of *each of us,* in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of *individual* dignity and choice upon which our political system rests." *Cohen v. California,* 403 U. S. 15, 24 (1971) (emphases added). See also *Sweezy v. New Hampshire,* 354 U. S. 234, 250 (1957) (plurality opinion) ("Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association"); *Richmond v. J. A. Croson Co.,* 488 U. S. 469, 493 (1989) (plurality opinion) ("As this Court has noted in the past, the 'rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal

rights'" (quoting *Shelley* v. *Kraemer*, 334 U. S. 1, 22 (1948))).
In short, the right to free speech is a right held by each
American, not by Americans en masse.  The Court in *Buck-
ley* provided no basis for suppressing the speech of an indi-
vidual candidate simply because other candidates (or candi-
dates in the aggregate) may succeed in reaching the voting
public.  And any such reasoning would fly in the face of the
premise of our political system—liberty vested in individual
hands safeguards the functioning of our democracy.  In the
case at hand, the Missouri scheme has a clear and detrimen-
tal effect on a candidate such as respondent Fredman, who
lacks the advantages of incumbency, name recognition, or
substantial personal wealth, but who has managed to attract
the support of a relatively small number of dedicated sup-
porters: It forbids his message from reaching the voters.
And the silencing of a candidate has consequences for politi-
cal debate and competition overall.  See *Arkansas Ed. Tele-
vision Comm'n* v. *Forbes*, 523 U. S. 666, 692, n. 14 (1998)
(STEVENS, J., dissenting) (noting that the suppression of a
minor candidate's speech may directly affect the outcome of
an election); cf. *NAACP* v. *Button*, 371 U. S. 415, 431 (1963)
("'All political ideas cannot and should not be channeled into
the programs of our two major parties.  History has amply
proved the virtue of political activity by minority, dissident
groups . . . '" (quoting *Sweezy* v. *New Hampshire, supra,* at
250–251 (plurality opinion))).

In my view, the Constitution leaves it entirely up to citi-
zens and candidates to determine who shall speak, the means
they will use, and the amount of speech sufficient to inform
and persuade.  *Buckley*'s ratification of the government's at-
tempt to wrest this fundamental right from citizens was
error.

### III

Today, the majority blindly adopts *Buckley*'s flawed rea-
soning without so much as pausing to consider the collapse of

the speech-by-proxy argument or the reality that *Buckley's* remaining premises fall when deprived of that support.[7]

After ignoring these shortcomings, the Court proceeds to apply something less—much less—than strict scrutiny. Just how much less the majority never says. The Court in *Buckley* at least purported to employ a test of " 'closest scrutiny.' " 424 U. S., at 25 (quoting *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 461 (1958)). (The Court's words were belied by its actions, however, and it never deployed the test in the fashion that the superlative instructs. See *Colorado Republican*, 518 U. S., at 640–641, n. 7 (THOMAS, J., concurring in judgment and dissenting in part) (noting that *Buckley* purported to apply strict scrutiny but failed to do so in fact).) The Court today abandons even that pretense and reviews contributions under the *sui generis* "*Buckley's* standard of scrutiny," *ante*, at 387, which fails to obscure the Court's ad hoc balancing away of First Amendment rights. Apart from its endorsement of *Buckley's* rejection of the intermediate standards of review used to evaluate expressive conduct and time, place, and manner restrictions, *ante*, at 386, the Court makes no effort to justify its deviation from the tests we traditionally employ in free speech cases. See *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 774 (1996) (SOUTER, J., concurring) ("Reviewing speech regulations under fairly strict categorical rules keeps the starch in the standards for those moments

---

[7] Implicitly, however, the majority downplays its reliance upon the speech-by-proxy argument. In fact, the majority reprints nearly all of *Buckley's* analysis of contributors' speech interests, block quoting almost an entire paragraph from that decision. See *ante*, at 386–387 (quoting *Buckley* v. *Valeo*, 424 U. S., at 20–21). Tellingly, the only complete sentence from that paragraph that the majority fails to quote is the final sentence—which happens to be the one directly setting forth the speech-by-proxy rationale. See *id.*, at 21 ("While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor").

when the daily politics cries loudest for limiting what may be said").

Unfortunately, the majority does not stop with a revision of *Buckley*'s labels. After hiding behind *Buckley*'s discredited reasoning and invoking *"Buckley*'s standard of scrutiny," *ante*, at 387, the Court proceeds to significantly extend the holding in that case. The Court's substantive departure from *Buckley* begins with a revision of our compelling-interest jurisprudence. In *Buckley*, the Court indicated that the only interest that could qualify as "compelling" in this area was the government's interest in reducing actual and apparent corruption.[8] 424 U. S., at 25–26. And the Court repeatedly used the word "corruption" in the narrow *quid pro quo* sense, meaning "[p]erversion or destruction of integrity in the discharge of public duties by bribery or favour." 3 Oxford English Dictionary 974 (2d ed. 1989). See also Webster's Third New International Dictionary 512 (1976) ("inducement (as of a political official) by means of improper considerations (as bribery) to commit a violation of duty"). When the Court set forth the interest in preventing actual corruption, it spoke about "large contributions . . . given to secure a political *quid pro quo* from current and potential office holders." *Buckley* v. *Valeo*, 424 U. S., at 26. The Court used similar language when it set forth the interest in protecting against the appearance of corruption: "Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial con-

---

[8] The Court in *Buckley* explicitly rejected two other proffered rationales for campaign finance regulation as out of tune with the First Amendment: equalization of the ability of citizens to affect the outcome of elections and controlling the costs of campaigns. See 424 U. S., at 48–49 (governmentally imposed equalization measures are "wholly foreign to the First Amendment"); *id.*, at 57 (mounting costs of elections "provid[e] no basis for governmental restrictions on the quantity of campaign spending").

tributions." *Id.*, at 27. Later, in discussing limits on independent expenditures, the Court yet again referred to the interest in protecting against the "dangers of actual or apparent *quid pro quo* arrangements." *Id.*, at 45. See also *id.*, at 47 (referring to "the danger that expenditures will be given as a *quid pro quo* for improper commitments"); *id.*, at 67 (corruption relates to "post-election special favors that may be given in return" for contributions). To be sure, after mentioning *quid pro quo* transactions, the Court went on to use more general terms such as "opportunities for abuse," *id.*, at 27, "potential for abuse," *id.*, at 47, "improper influence," *id.*, at 27, 29, 45, "attempts . . . to influence," *id.*, at 28, and "buy[ing] influence," *id.*, at 45. But this general language acquires concrete meaning only in light of the preceding specific references to *quid pro quo* arrangements.

Almost a decade after *Buckley*, we reiterated that "corruption" has a narrow meaning with respect to contribution limitations on individuals:

> "Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial *quid pro quo:* dollars for political favors." *National Conservative Political Action Comm.*, 470 U. S., at 497.

In that same opinion, we also used "giving official favors" as a synonym for corruption. *Id.*, at 498.

The majority today, by contrast, separates "corruption" from its *quid pro quo* roots and gives it a new, far-reaching (and speech-suppressing) definition, something like "[t]he perversion of anything from an original state of purity." 3 Oxford English Dictionary, *supra*, at 974. See also Webster's Third New International Dictionary, *supra*, at 512 ("a departure from what is pure or correct"). And the Court proceeds to define that state of purity, casting aspersions on

"politicians too compliant with the wishes of large contributors." *Ante*, at 389. "But precisely what the 'corruption' may consist of we are never told with assurance." *National Conservative Political Action Comm.*, *supra*, at 498. Presumably, the majority does not mean that politicians should be free of attachments to constituent groups.[9] And the majority does not explicitly rely upon the "harm" that the Court in *Buckley* rejected out of hand, namely, that speech could be regulated to equalize the voices of citizens. *Buckley* v. *Valeo*, *supra*, at 48–49. Instead, without bothering to offer any elaboration, much less justification, the majority permits vague and unenumerated harms to suffice as a compelling reason for the government to smother political speech.

In refashioning *Buckley*, the Court then goes on to weaken the requisite precision in tailoring, while at the same time representing that its fiat "do[es] not relax *Buckley*'s standard." *Ante*, at 390, n. 4. The fact is that the majority rati-

---

[9] The Framers, of course, thought such attachments inevitable in a free society and that faction would infest the political process. As to controlling faction, James Madison explained, "There are again two methods of removing the causes of faction: the one, by destroying the liberty which is essential to its existence; the other, by giving to every citizen the same opinions, the same passions, and the same interests." The Federalist No. 10, p. 78 (C. Rossiter ed. 1961). Contribution caps are an example of the first method, which Madison contemptuously dismissed:

"It could never be more truly said than of the first remedy that it was worse than the disease. Liberty is to faction what air is to fire, an aliment without which it instantly expires. But it could not be a less folly to abolish liberty, which is essential to political life, because it nourishes faction than it would be to wish the annihilation of air, which is essential to animal life, because it imparts to fire its destructive agency." *Ibid.*

The Framers preferred a political system that harnessed such faction for good, preserving liberty while also ensuring good government. Rather than adopting the repressive "cure" for faction that the majority today endorses, the Framers armed individual citizens with a remedy. "If a faction consists of less than a majority, relief is supplied by the republican principle, which enables the majority to defeat its sinister views by regular vote." *Id.*, at 80.

fies a law with a much broader sweep than that approved in *Buckley*. In *Buckley*, the Court upheld contribution limits of $1,000 on individuals and $5,000 on political committees (in 1976 dollars). 424 U. S., at 28–29, 35–36. Here, by contrast, the Court approves much more restrictive contribution limitations, ranging from $250 to $1,000 (in 1995 dollars) for both individuals and political committees. Mo. Rev. Stat. § 130.032.1 (Supp. 1999). The disparity between Missouri's caps and those upheld in *Buckley* is more pronounced when one takes into account some measure of inflation. See *Shrink Missouri Government PAC* v. *Adams*, 161 F. 3d 519, 523, and n. 4 (CA8 1998) (noting that, according to the Consumer Price Index, a dollar today purchases about a third of what it did in 1976 when *Buckley* was decided). Yet the Court's opinion gives not a single indication that the two laws may differ in their tailoring. See *ante*, at 395 (Missouri's caps are "striking [in their] resemblance to the limitations sustained in *Buckley*"). The Court fails to pay any regard to the drastically lower level of the limits here, fails to explain why political committees should be subjected to the same limits as individuals, and fails to explain why caps that vary with the size of political districts are tailored to corruption. I cannot fathom how a $251 contribution could pose a substantial risk of "secur[ing] a political *quid pro quo*." *Buckley* v. *Valeo, supra*, at 26. Thus, contribution caps set at such levels could never be "closely drawn," *ante*, at 387 (quoting *Buckley* v. *Valeo, supra*, at 25), to preventing *quid pro quo* corruption. The majority itself undertakes no such defense.

The Court also reworks *Buckley*'s aggregate approach to the free speech rights of candidates. It begins on the same track as *Buckley*, noting that "a showing of one affected individual does not point up a system of suppressed political advocacy that would be unconstitutional under *Buckley*." *Ante*, at 396. See also, *e. g., ibid.* (claiming that candidates " 'are still able to amass impressive campaign war chests' "

(quoting *Shrink Missouri Government PAC* v. *Adams,* 5 F. Supp. 2d 734, 741 (ED Mo. 1998))). But the Court quickly deviates from *Buckley,* persuading itself that Missouri's limits do not suppress political speech because, prior to the enactment of contribution limits, "97.62 percent of all contributors to candidates for state auditor made contributions of $2,000 or less." *Ante,* at 396. But this statistical anecdote offers the Court no refuge and the citizenry no comfort. As an initial matter, the statistic provides no assurance that Missouri's law has not reduced the resources supporting political speech, since the largest contributors provide a disproportionate amount of funds. The majority conspicuously offers no data revealing the percentage of funds provided by large contributors. (At least the Court in *Buckley* relied on the *percentage of funds* raised by contributions in excess of the limits. 424 U. S., at 21–22, n. 23, 26, n. 27.) But whatever the data would reveal, the Court's position would remain indefensible. If the majority's assumption is incorrect—*i. e.,* if Missouri's contribution limits actually do significantly reduce campaign speech—then the majority's calm assurance that political speech remains unaffected collapses. If the majority's assumption is correct—*i. e.,* if large contributions provide very little assistance to a candidate seeking to get out his message (and thus will not be missed when capped)—then the majority's reasoning still falters. For if large contributions offer as little help to a candidate as the Court maintains, then the Court fails to explain why a candidate would engage in "corruption" for such a meager benefit. The majority's statistical claim directly undercuts its constitutional defense that large contributions pose a substantial risk of corruption.[10]

---

[10] The majority's statistical analysis also overlooks the quantitative data in the record that directly undercut its position that Missouri's law does not create "a system of suppressed political advocacy." *Ante,* at 396. For example, the Court does not bother to note that following the imposition of contribution limits, total combined spending during primary and

Given the majority's ill-advised and illiberal aggregate rights approach, it is unsurprising that the Court's *pro forma* hunt for suppressed speech proves futile. See *ante*, at 395–397. Such will always be the case, for courts have no yardstick by which to judge the proper amount and effectiveness of campaign speech. See, *e. g.*, Smith, Faulty Assumptions and Undemocratic Consequences of Campaign Finance Reform, 105 Yale L. J. 1049, 1061 (1996). I, however, would not fret about such matters. The First Amendment vests choices about the proper amount and effectiveness of political advocacy not in the government—whether in the legislatures or the courts—but in the people.

## IV

In light of the importance of political speech to republican government, Missouri's substantial restriction of speech warrants strict scrutiny, which requires that contribution limits be narrowly tailored to a compelling governmental interest. See *Buckley* v. *American Constitutional Law Foundation, Inc.*, 525 U. S. 182, 207 (1999) (THOMAS, J., concurring in judgment); *Colorado Republican*, 518 U. S., at 640–641 (THOMAS, J., concurring in judgment and dissenting in part).

---

general elections for five statewide offices was cut by over half, falling from $21,599,000 to $9,337,000. See App. 24–28. Significantly, total primary election expenditures in each of the races decreased. *Ibid.* In fact, after contribution limits were imposed, overall spending in statewide primary elections plummeted 89 percent, falling from $14,249,000 to $1,625,000. *Ibid.* Most importantly, the majority does not bother to mention that before spending caps were enacted each of the 10 statewide primary elections was contested, with two to four candidates vying for every nomination in 1992. After caps were enacted, however, only 1 of the 10 primary elections was contested. Overall, the total number of candidates participating in statewide primaries fell from 32 to 11. See *ibid.* Even if these data do not conclusively show that Missouri's contribution limits diminish political speech (although it is undeniable that the data strongly suggest such a result), they at least cast great doubt on the majority's assumption that the picture is rosy.

Missouri does assert that its contribution caps are aimed at preventing actual and apparent corruption. Brief for Petitioners 26–28. As we have noted, "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *National Conservative Political Action Comm.*, 470 U. S., at 496–497. But the State's contribution limits are not narrowly tailored to that harm. The limits directly suppress the political speech of both contributors and candidates, and only clumsily further the governmental interests that they allegedly serve. They are crudely tailored because they are massively overinclusive, prohibiting all donors who wish to contribute in excess of the cap from doing so and restricting donations without regard to whether the donors pose any real corruption risk. See *Colorado Republican, supra,* at 642 (THOMAS, J., concurring in judgment and dissenting in part) ("'Where First Amendment rights are involved, a blunderbuss approach which prohibits mostly innocent speech cannot be held a means narrowly and precisely directed to the governmental interest in the small minority of contributions that are not innocent'" (quoting Brief for Appellants in *Buckley* v. *Valeo,* O. T. 1975, Nos. 75–436 and 75–437, pp. 117–118)). See also *Martin* v. *City of Struthers,* 319 U. S. 141, 145 (1943) (Though a method of speaking may be "a blind for criminal activities, [it] may also be useful [to] members of society engaged in the dissemination of ideas in accordance with the best tradition of free discussion"). Moreover, the government has less restrictive means of addressing its interest in curtailing corruption. Bribery laws bar precisely the *quid pro quo* arrangements that are targeted here. And disclosure laws "'deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.'" *American Constitutional Law Foundation, supra,* at 202 (quoting *Buckley* v. *Valeo,* 424 U. S., at 67). In fact, Missouri has enacted strict disclo-

sure laws. See Mo. Rev. Stat. §§ 130.041, 130.046, 130.057 (Supp. 1999).

In the end, contribution limitations find support only in the proposition that other means will not be as effective at rooting out corruption. But when it comes to a significant infringement on our fundamental liberties, that some undesirable conduct may not be deterred is an insufficient justification to sweep in vast amounts of protected political speech. Our First Amendment precedents have repeatedly stressed this point. For example, in *Martin* v. *City of Struthers, supra,* we struck down an ordinance prohibiting door-to-door distribution of handbills. Although we recognized that "burglars frequently pose as canvassers," *id.,* at 144, we also noted that door-to-door distribution was "useful [to] members of society engaged in the dissemination of ideas in accordance with the best tradition of free discussion," *id.,* at 145. We then struck down the ordinance, observing that the "dangers of distribution can so easily be controlled by traditional legal methods." *Id.,* at 147. Similarly, in *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781 (1988), we struck down a law regulating the fees charged by professional fundraisers. In response to the assertion that citizens would be defrauded in the absence of such a law, we explained that the State had an antifraud law which "we presume[d] that law enforcement officers [we]re ready and able to enforce," *id.,* at 795, and that the State could constitutionally require fundraisers to disclose certain financial information, *ibid.* We concluded by acknowledging the obvious consequences of the narrow tailoring requirement: "If this is not the most efficient means of preventing fraud, we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency." *Ibid.* See also, *e. g., Schneider* v. *State (Town of Irvington),* 308 U. S. 147, 162 (1939) ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets").

The same principles apply here, and dictate a result contrary to the one the majority reaches. States are free to enact laws that directly punish those engaged in corruption and require the disclosure of large contributions, but they are not free to enact generalized laws that suppress a tremendous amount of protected speech along with the targeted corruption.

V

Because the Court unjustifiably discounts the First Amendment interests of citizens and candidates, and consequently fails to strictly scrutinize the inhibition of political speech and competition, I respectfully dissent.