Justice Kennedy,
concurring in the judgment.
The Court decides the constitutionality of the limitations Vermont places on campaign expenditures and contributions. I agree that both limitations violate the First Amendment.
As the plurality notes, our cases hold that expenditure limitations “place substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the First Amendment cannot tolerate.” Buckley v. Valeo, 424 U. S. 1, 58-59 (1976) (per curiam); see also Colorado Republican Federal Campaign Comm. v. Federal Election Comm’n, 518 U. S. 604, 618 (1996) (principal opinion); Federal Election Comm’n v. National Conservative Political Action Comm., 470 U. S. 480, 497 (1985).
The parties neither ask the Court to overrule Buckley in full nor challenge the level of scrutiny that decision applies to campaign contributions. The exacting scrutiny the plurality applies to expenditure limitations, however, is appropriate. For the reasons explained in the plurality opinion, respondents’ attempts to distinguish the present limitations from those we have invalidated are unavailing. The Court has upheld contribution limits that do “not come even close to passing any serious scrutiny.” Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 410 (2000) (Kennedy, J., dissenting). Those concerns aside, Vermont’s contributions, as the plurality’s detailed analysis indicates, are even more stifling than the ones that survived Shrink’s unduly lenient review.
The universe of campaign finance regulation is one this Court has in part created and in part permitted by its course of decisions. That new order may cause more problems than *265 it solves. On a routine, operational level the present system requires us to explain why $200 is too restrictive a limit while $1,500 is not. Our own experience gives us little basis to make these judgments, and certainly no traditional or well-established body of law exists to offer guidance. On a broader, systemic level political parties have been denied basic First Amendment rights. See, e. g., McConnell v. Federal Election Comm’n, 540 U. S. 93, 286-287, 313 (2003) (Kennedy, J., concurring in judgment in part and dissenting in part). Entering to fill the void have been new entities such as political action committees, which are as much the creatures of law as of traditional forces of speech and association. Those entities can manipulate the system and attract their own elite power brokers, who operate in ways obscure to the ordinary citizen.
Viewed within the legal universe we have ratified and helped create, the result the plurality reaches is correct; given my own skepticism regarding that system and its operation, however, it seems to me appropriate to concur only in the judgment.
Justice Thomas, with whom Justice Scalia joins, concurring in the judgment.
Although I agree with the plurality that Vt. Stat. Ann., Tit. 17, §2801 et seq. (2002) (Act 64 or Act), is unconstitutional, I disagree with its rationale for striking down that statute. Invoking stare decisis, the plurality rejects the invitation to overrule Buckley v. Valeo, 424 U. S. 1 (1976) (per curiam).[1] It then applies Buckley to invalidate the expenditure limitations and, less persuasively, the contribution limi *266 tations. I continue to believe that Buckley provides insufficient protection to political speech, the core of the First Amendment. The illegitimacy of Buckley is further underscored by the continuing inability of the Court (and the plurality here) to apply Buckley in a coherent and principled fashion. As a result, stare decisis should pose no bar to overruling Buckley and replacing it with a standard faithful to the First Amendment. Accordingly, I concur only in the judgment.
I
I adhere to my view that this Court erred in Buckley when it distinguished between contribution and expenditure limits, finding the former to be a less severe infringement on First Amendment rights. See Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 410-418 (2000) (Shrink) (dissenting opinion); Federal Election Comm’n v. Colorado Republican Federal Campaign Comm., 533 U. S. 431, 465-466 (2001) (Colorado II) (same); Colorado Republican Federal Campaign Comm. v. Federal Election Comm’n, 518 U. S. 604, 635-644 (1996) (Colorado I) (opinion concurring in judgment and dissenting in part). “[Ujnlike the Buckley Court, I believe that contribution limits infringe as directly and as seriously upon freedom of political expression and association as do expenditure limits.” Id., at 640. The Buckley Court distinguished contributions from expenditures based on the presence of an intermediary between a contributor and the speech eventually produced. But that reliance is misguided, given that “[ejven in the case of a direct expenditure, there is usually some go-between that facilitates the dissemination of the spender’s message.” Colorado I, supra, at 638-639 (opinion of Thomas, J.); Shrink, supra, at 413-418 (Thomas, J., dissenting). Likewise, Buckley’s suggestion that contribution caps only marginally restrict speech, because “[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support,” 424 U. S., *267 at 21, even if descriptively accurate, does not support restrictions on contributions. After all, statements of general support are as deserving of constitutional protection as those that communicate specific reasons for that support. Colorado I, supra, at 639-640 (opinion of Thomas, J.); Shrink, supra, at 414-415, and n. 3 (Thomas, J., dissenting). Accordingly, I would overrule Buckley and subject both the contribution and expenditure restrictions of Act 64 to strict scrutiny, which they would fail. See Colorado I, supra, at 640-641 (opinion of Thomas, J.) (“I am convinced that under traditional strict scrutiny, broad prophylactic caps on both' spending and giving in the political process ... are unconstitutional”). See also Colorado II, supra, at 465-466 (Thomas, J., dissenting).
II
The plurality opinion, far from making the case for Buckley as a rule of law, itself demonstrates that Buckley’s limited scrutiny of contribution limits is “insusceptible of principled application,” and accordingly is not entitled to stare decisis effect. See BMW of North America, Inc. v. Gore, 517 U. S. 559, 599 (1996) (Scalia, J., dissenting). Indeed, “ ‘when governing decisions are unworkable or are badly reasoned, this Court has never felt constrained to follow precedent.’” Vieth v. Jubelirer, 541 U. S. 267, 306 (2004) (plurality opinion) (quoting Payne v. Tennessee, 501 U. S. 808, 827 (1991); internal quotation marks omitted). Today’s newly minted, multifactor test, particularly when read in combination with the Court’s decision in Shrink, supra, places this Court in the position of addressing the propriety of regulations of political speech based upon little more than its impression of the appropriate limits.
The plurality sets forth what appears to be a two-step process for evaluating the validity of contribution limits: First, determine whether there are “danger signs” in a particular case that the limits are too low; and, second, use “independent judicial judgment” to “review the record inde *268 pendently and carefully with an eye toward assessing the statute’s ‘tailoring,’ that is, toward assessing the proportionality of the restrictions.” Ante, at 249. Neither step of this test can be reduced to a workable inquiry to be performed by States attempting to comply with this Court’s jurisprudence.
As to the first step, it is entirely unclear how to determine whether limits are so low as to constitute “danger signs” that require a court to “examine the record independently and carefully.” Ante, at 253. The plurality points to several aspects of the Act that support its conclusion that such signs are present here: (1) The limits are set per election cycle, rather than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3) the limits are the lowest in the Nation; and (4) the limits are below those we have previously upheld. Ante, at 249-253.
The first two elements of the Act are indeed constitutionally problematic, but they have no bearing on whether the contribution limits are too low. The first substantially advantages candidates in a general election who did not face a serious primary challenge. In practice, this restriction will generally suppress more speech by challengers than by incumbents, without serving the interests the Court has recognized as compelling, i. e., the prevention of corruption or the appearance thereof. Cf. B. Smith, Unfree Speech: The Folly of Campaign Finance Reform 50-51 (2001) (hereinafter Smith) (describing the ability of incumbents to amass money early, discouraging serious challengers from entering a race). The second element has no relation to these compelling interests either, given that “ ‘[t]he very aim of a political party is to influence its candidate’s stance on issues and, if the candidate takes office or is reelected, his votes.’” Colorado II, supra, at 476 (Thomas, J., dissenting) (citing Colorado I, supra, at 646 (Thomas, J., concurring in judgment and dissenting in part)). That these provisions are unconstitutional, however, does not make the contribution limits on individuals unconstitutionally low.
*269 We are left, then, with two reasons to scrutinize Act 64’s limitations: They are lower than those of other States, and lower than those we have upheld in previous cases, i. e., Buckley and Shrink. But the relative limits of other States cannot be the key factor, for such considerations are nothing more than a moving target. After all, if the Vermont Legislature simply persuaded several other States to lower their contribution limits to parallel Act 64, then the Act, which would still “significantly restrict the amount of funding available for challengers to run competitive campaigns,” ante, at 253, would survive this aspect of the plurality’s proposed test.
Nor is the relationship of these limits to those in Buckley and Shrink a critical fact. In Shrink, the Court specifically determined that Buckley did not “set a minimum constitutional threshold for contribution limits,” rejecting such a contention as a “fundamental misunderstanding of what we held.” 528 U. S., at 396. The plurality’s current treatment of the limits in Shrink as a constitutional minimum, or at least as limits below which “danger signs” are present, thus cannot be reconciled with Shrink itself.
Having nevertheless concluded that these “danger signs” require us to scrutinize the record, the plurality embarks on an odd review of the contribution limits, combining unrelated factors to determine that, “[t]aken together,” ante, at 253, the restrictions of Act 64 are not closely drawn to meet their objectives. Two of these factors simply cause the already stringent limitations on individual contributions to be more stringent; i. e., volunteer services count toward the contribution limit, ante, at 259-260, and the limits do not change with inflation, so they will become even more stringent in time, ante, at 261.[2] While these characteristics confirm the plu *270 rality’s impression that these limits are, indeed, quite low, they have nothing whatsoever to do with whether the restrictions are closely drawn to meet their objectives. The plurality would presumably uphold a limit on contributions of $1 million, even if volunteer services counted toward that limit and the limit did not change with inflation. Characterizing these facts as shifting Act 64’s limits from “suspiciously low” to “too low,” ibid., provides no insight on how to draw this constitutional line.
The plurality next departs from the general applicability of the contribution limits entirely, and notes the substantial interference of the contribution limits with the activities of parties. Again, I do not dispute that the limitation on party contributions is unconstitutional; as I have previously noted, such limitations are unconstitutional even under Buckley. See Colorado II, 533 U. S., at 476-477 (dissenting opinion). But it is entirely unclear why the mere fact that the “suspiciously low” contribution limits also apply to parties should mean that those limits are in fact “too low” when they are applied to individuals. If the limits impermissibly intrude upon the associational rights of parties, then the limits are unconstitutional as applied to parties. But limits on individuals cannot be transformed from permissible to too low simply because they also apply to political parties.[3]
*271 We are left, then, with two arguably relevant points to transform these contribution limits from the realm of the “suspicious” to the realm of the impermissible. First, the limits affect a substantial portion of the money given to challengers. But contribution limits always disproportionately burden challengers, who often have smaller bases of support than incumbents. See Smith 66-70. In Shrink, the Court expressly rejected the argument that a negative impact on a challenger could render a contribution limit invalid, relying on the same sort of analysis of the “average effect of contribution limits on fundraising,” ante, at 255, that the plurality today rejects. See 528 U. S., at 396 (noting that 97.62% of all contributors for state auditor made contributions of less than $2,000, and that “[e]ven if we were to assume that the contribution limits affected respondent's] ability to wage a competitive campaign ... a showing of one affected individual does not point up a system of suppressed political advocacy that would be unconstitutional under Buckley”). Cf. id., at 420 (Thomas, J., dissenting) (“The Court in Buckley provided no basis for suppressing the speech of an individual candidate simply because other candidates (or candidates in the aggregate) may succeed in reaching the voting public. . . . [A]ny such reasoning would fly in the face of the premise of our political system—liberty vested in individual hands safeguards the functioning of our democracy”). An individual’s First Amendment right is infringed whether his speech is decreased by 5% or 95%, and whether he suffers *272 alone or shares his violation with his fellow citizens. Certainly, the First Amendment does not authorize us to judge whether a restriction of political speech imposes a sufficiently severe disadvantage on challengers that a candidate should be able to complain. See Shrink, supra, at 427 (Thomas, J., dissenting) (“[Cjourts have no yardstick by which to judge the proper amount and effectiveness of campaign speech”).
The plurality’s final justification fares no better. Arguing that Vermont offers no justification for imposing a limit lower than that imposed in any other State is simply another way of saying that the benchmark for whether a contribution limitation is constitutional is what other States have imposed. As I have noted above, supra, at 269, tying individuals’ First Amendment rights to the presence or absence of similar laws in other States is inconsistent with the First Amendment.
The plurality recognizes that the burdens which lead it to invalidate Act 64’s contribution limits are present under “many, though not all, campaign finance regulations.” Ante, at 262. As a result, the plurality does not purport to offer any single touchstone for evaluating the constitutionality of such laws. Indeed, its discussion offers nothing resembling a rule at all. From all appearances, the plurality simply looked at these limits and said, in its “independent judicial judgment,” ante, at 249, that they are too low. The atmospherics—whether they vary with inflation, whether they are as high as those in other States or those in Shrink and Buckley, whether they apply to volunteer activities and parties—no doubt help contribute to the plurality’s sentiment. But a feeling does not amount to a workable rule of law.
This is not to say that the plurality errs in concluding that these limits are too low to satisfy even Buckley’s lenient standard. Indeed, it is almost impossible to imagine that any legislator would ever find his scruples overcome by a $201 donation. See Shrink, supra, at 425 (Thomas, J., dis *273 senting) (“I cannot fathom how a $251 contribution could pose a substantial risk of ‘secur[ing] a political quid pro quo’ ” (quoting Buckley, 424 U. S., at 26)). And the statistics relied on by the plurality indeed reveal that substantial resources will be lost by candidates running campaigns under these limits. See ante, at 253-256. Given that these contribution limits severely impinge on the ability of candidates to run campaigns and on the ability of citizens to contribute to campaigns, and do so without any demonstrable need to avoid corruption, they cannot possibly satisfy even Buckley’s ambiguous level of scrutiny.
But the plurality’s determination that this statute clearly lies on the impermissible side of the constitutional line gives no assistance in drawing this line, and it is clear that no such line can be drawn rationally. There is simply no way to calculate just how much money a person would need to receive before he would be corrupt or perceived to be corrupt (and such a calculation would undoubtedly vary by person). Likewise, there is no meaningful way of discerning just how many resources must be lost before speech is “disproportionately burden[ed].” Ante, at 262. Buckley, as the plurality has applied it, gives us license to simply strike down any limits that just seem to be too stringent, and to uphold the rest. The First Amendment does not grant us this authority. Buckley provides no consistent protection to the core of the First Amendment, and must be overruled.
* * *
For these reasons, I concur only in the judgment.

 Although the plurality’s stare decisis analysis is limited to Buckley’s treatment of expenditure limitations, its reasoning cannot be so confined, and would apply equally to Buckley’s standard for evaluating contribution limits. See ante, at 244 (noting, inter alia, that Buckley has engendered “considerable reliance” that would be “dramatically undermine[d]” by overruling it now).

 Ironically, the plurality is troubled by the fact that the absence of a provision adjusting the limits for inflation means that the real value of the limits will decline, and that “the burden of preventing the decline [lies] upon incumbent legislators who may not diligently police the need for changes in limit levels to ensure the adequate financing of electoral chai *270 lenges.” Ante, at 261. It is impossible to square this wariness of incumbents’ disinclination to enact future laws protecting challengers with the plurality’s deference to those same incumbents when they make empirical judgments regarding “the precise restriction necessary to carry out the statute’s legitimate objectives” in the first place. Ante, at 248.

 The plurality’s connection of these two factors implies that it is concerned not with the impact on the speech of contributors, but solely with the speech of candidates, for whom the two facts might be connected. See ante, at 253. Indeed, the plurality notably omits interference with participation in campaigns through monetary contributions from the list of reasons the Act is unconstitutional. See ante, at 253, 261. But contributors, too, have a right to free speech. See Colorado I, 518 U. S. 604, 637 (1996) *271 (Thomas, J., concurring in judgment and dissenting in part) (“If an individual is limited in the amount of resources he can contribute to the pool, he is most certainly limited in his ability to associate for purposes of effective advocacy”). Even Buckley v. Valeo, 424 U. S. 1 (1976) (per curiam), recognizes that contribution limits restrict the free speech of contributors, even if it understates the significance of this restriction. See id., at 20-21 (“[A] limitation upon the amount that any one person or group may contribute to a candidate . . . entails only a marginal restriction upon the contributor’s ability to engage in free communication”).