*480 Justice Thomas,
concurring in part and dissenting in part.
I join all but Part IV of the Court’s opinion.
Political speech is entitled to robust protection under the First Amendment. Section 203 of the Bipartisan Campaign Reform Act of 2002 (BCRA) has never been reconcilable with that protection. By striking down §203, the Court takes an important first step toward restoring full constitutional protection to speech that is “indispensable to the effective and intelligent use of the processes of popular government.” McConnell v. Federal Election Comm’n, 540 U. S. 93, 265 (2003) (Thomas, J., concurring in part, concurring in judgment in part, and dissenting in part) (internal quotation marks omitted). I dissent from Part IV of the Court’s opinion, however, because the Court’s constitutional analysis does not go far enough. The disclosure, disclaimer, and reporting requirements in BCRA §§201 and 311 are also unconstitutional. See id., at 275-277, and n. 10.
Congress may not abridge the “right to anonymous speech” based on the “ ‘simple interest in providing voters with additional relevant information,’” id., at 276 (quoting McIntyre v. Ohio Elections Comm’n, 514 U. S. 334, 348 (1995)). In continuing to hold otherwise, the Court misapprehends the import of “recent events” that some amici describe “in which donors to certain causes were blacklisted, threatened, or otherwise targeted for retaliation.” Ante, at 370. The Court properly recognizes these events as “cause for concern,” ibid., but fails to acknowledge their constitutional significance. In my view, amici’s submissions show why the Court’s insistence on upholding §§201 and 311 will ultimately prove as misguided (and ill fated) as was its prior approval of § 203.
Amici’s examples relate principally to Proposition 8, a state ballot proposition that California voters narrowly passed in the 2008 general election. Proposition 8 amended *481 California’s Constitution to provide that “[o]nly marriage between a man and a woman is valid or recognized in California.” Cal. Const., Art. I, §7.5. Any donor who gave more than $100 to any committee supporting or opposing Proposition 8 was required to disclose his full name, street address, occupation, employer’s name (or business name, if self-employed), and the total amount of his contributions.[1] See Cal. Govt. Code Ann. § 84211(f) (West 2005). The California Secretary of State was then required to post this information on the Internet. See §§84600-84601; §§84602-84602.1 (West Supp. 2010); §§84602.5-84604 (West 2005); §85605 (West Supp. 2010); §§84606-84609 (West 2005).
Some opponents of Proposition 8 compiled this information and created Web sites with maps showing the locations of homes or businesses of Proposition 8 supporters. Many supporters (or their customers) suffered property damage, or threats of physical violence or death, as a result. They cited these incidents in a complaint they filed after the 2008 election, seeking to invalidate California’s mandatory disclosure laws. Supporters recounted being told: “ ‘Consider yourself lucky. If I had a gun I would have gunned you down along with each and every other supporter,’ ” or, “ ‘we have plans for you and your friends.’ ” Complaint in ProtectMarriage.com—Yes on 8 v. Bowen, Case No. 2:09-cv-00058-MCE-DAD (ED Cal.), ¶ 31. Proposition 8 opponents also allegedly harassed the measure’s supporters by defacing or damaging their property. Id., ¶ 32. Two religious organizations supporting Proposition 8 reportedly received through the mail envelopes containing a white powdery substance. Id., ¶ 33.
*482 Those accounts are consistent with media reports describing Proposition 8-related retaliation. The director of the nonprofit California Musical Theater gave $1,000 to support the initiative; he was forced to resign after artists complained to his employer. Lott & Smith, Donor Disclosure Has Its Downsides, Wall Street Journal, Dec. 26, 2008, p. A1B. The director of the Los Angeles Film Festival was forced to resign after giving $1,500 because opponents threatened to boycott and picket the next festival. Ibid. And a woman who had managed her popular, family-owned restaurant for 26 years was forced to resign after she gave $100, because “throngs of [angry] protesters” repeatedly arrived at the restaurant and “shout[ed] ‘shame on you’ at customers.” Lopez, Prop. 8 Stance Upends Her Life, Los Angeles Times, Dec. 14, 2008, p. Bl. The police even had to “arriv[e] in riot gear one night to quell the angry mob” at the restaurant. Ibid. Some supporters of Proposition 8 engaged in similar tactics; one real estate businessman in San Diego who had donated to a group opposing Proposition 8 “received a letter from the Prop. 8 Executive Committee threatening to publish his company’s name if he didn’t also donate to the ‘Yes on 8’ campaign.” Donor Disclosure, supra, at A13.
The success of such intimidation tactics has apparently spawned a cottage industry that uses forcibly disclosed donor information to pre-empt citizens’ exercise of their First Amendment rights. Before the 2008 Presidential election, a “newly formed nonprofit group ... plannfed] to confront donors to conservative groups, hoping to create a chilling effect that will dry up contributions.” Luo, Group Plans Campaign Against G.O.P. Donors, N. Y. Times, Aug. 8, 2008, p. A15. Its leader, “who described his effort as ‘going for the jugular,’ ” detailed the group’s plan to send a “warning letter... alerting donors who might be considering giving to right-wing groups to a variety of potential dangers, including *483 legal trouble, public exposure and watchdog groups digging through their lives.” Ibid.
These instances of retaliation sufficiently demonstrate why this Court should invalidate mandatory disclosure and reporting requirements. But amici present evidence of yet another reason to do so — the threat of retaliation from elected officials. As amici’s submissions make clear, this threat extends far beyond a single ballot proposition in California. For example, a candidate challenging an incumbent state attorney general reported that some members of the State’s business community feared donating to his campaign because they did not want to cross the incumbent; in his words, “T go to so many people and hear the same thing: “I sure hope you beat [the incumbent], but I can’t afford to have my name on your records. He might come after me next. ” ’ ” Strassel, Challenging Spitzerism at the Polls, Wall Street Journal, Aug. 1, 2008, p. All. The incumbent won reelection in 2008.
My point is not to express any view on the merits of the political controversies I describe. Rather, it is to demonstrate — using real-world, recent examples — the fallacy in the Court’s conclusion that “[disclaimer and disclosure requirements . . . impose no ceiling on campaign-related activities, and do not prevent anyone from speaking.” Ante, at 366 (internal quotation marks and citation omitted). Of course they do. Disclaimer and disclosure requirements enable private citizens and elected officials to implement political strategies specifically calculated to curtail campaign-related activity and prevent the lawful, peaceful exercise of First Amendment rights.
The Court nevertheless insists that as-applied challenges to disclosure requirements will suffice to vindicate those speech rights, as long as potential plaintiffs can “show a reasonable probability that disclosure . . . will subject them to threats, harassment, or reprisals from either Government of *484 ficials or private parties.” Ante, at 367 (internal quotation marks omitted). But the Court’s opinion itself proves the irony in this compromise. In correctly explaining why it must address the facial constitutionality of § 203, see ante, at 322-336, the Court recognizes that “[t]he First Amendment does not permit laws that force speakers to ... seek declaratory rulings before discussing the most salient political issues of our day,” ante, at 324; that as-applied challenges to §203 “would require substantial litigation over an extended time” and result in an “interpretive process [that] itself would create an inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable,” ante, at 326-327; that “a court would be remiss in performing its duties were it to accept an unsound principle merely to avoid the necessity of making a broader ruling,” ante, at 329; and that avoiding a facial challenge to § 203 “would prolong the substantial, nationwide chilling effect” that § 203 causes, ante, at 333. This logic, of course, applies equally to as-applied challenges to §§201 and 311.
Irony aside, the Court’s promise that as-applied challenges will adequately protect speech is a hollow assurance. Now more than ever, §§201 and 311 will chill protected speech because — as California voters can attest — “the advent of the Internet” enables “prompt disclosure of expenditures,” which “provide [s]” political opponents “with the information needed” to intimidate and retaliate against their foes. Ante, at 370. Thus, “disclosure permits citizens ... to react to the speech of [their political opponents] in a proper” — or undeniably improper — “way” long before a plaintiff could prevail on an as-applied challenge.[2] Ante, at 371.
*485 I cannot endorse a view of the First Amendment that subjects citizens of this Nation to death threats, ruined careers, damaged or defaced property, or pre-emptive and threatening warning letters as the price for engaging in “core political speech, the 'primary object of First Amendment protection.”’ McConnell, 540 U. S., at 264 (Thomas, J., concurring in part, concurring in judgment in part, and dissenting in part) (quoting Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 410-411 (2000) (Thomas, J., dissenting)). Accordingly, I respectfully dissent from the Court’s judgment upholding BCRA §§201 and 311.

 BCRA imposes similar disclosure requirements. See, e. g., 2 U. S. C. § 434(f)(2)(F) (“Every person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year” must disclose “the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement”).

 But cf. Hill v. Colorado, 530 U.S. 703, 707-710 (2000) (approving a statute restricting speech “within 100 feet” of abortion clinics because it protected women seeking an abortion from “‘sidewalk counseling,”’ which “consists of efforts ‘to educate, counsel, persuade, or inform passersby about abortion and abortion alternatives by means of verbal or written *485 speech,’” and which “sometimes” involved “strong and abusive language in face-to-face encounters”).